**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

_____

|  |  |  |
|---|---|---|
| CUSTOM HAIR DESIGNS BY SANDY, LLC, and SKIP'S PRECISION WELDING, LLC, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CASE NO. _____17-310_____ |
| CENTRAL PAYMENT CO., LLC, | ) ) | |
| Defendant. | ) ) ) | **<u>JURY TRIAL DEMANDED</u>** |

_____

## <u>CLASS ACTION COMPLAINT</u>

COME NOW Plaintiffs Custom Hair Designs by Sandy, LLC and Skip's Precision Welding, LLC, on behalf of themselves and the class of persons and entities preliminarily defined below, and complain and allege as follows, based on personal knowledge as to allegations regarding Plaintiffs and on information and belief as to all other matters.

### <u>INTRODUCTION</u>

1.      This action challenges the assessment and seizure of unauthorized and excessive fees for merchant payment processing services by Defendant Central Payment Co., LLC. Herein, Defendant is referred to as "CPAY," the acronym it has created for itself.

2.      In today's business world, the vast majority of merchants must accept payment for goods and services via credit and debit cards to stay competitive in the marketplace. In order to accept this method of payment, a merchant must utilize a payment processing service.

3.      Merchants rely on the companies that provide this critical service to do so in accordance with fair and appropriate terms. Indeed, for many businesses, fees for card processing services are likely to be the third highest expense following labor and product costs.

4.      The card processing system can be a difficult one to understand, with many involved parties.  For instance, in addition to the merchant who receives payment and the customer who provides such payment, the processing of a card transaction involves several other parties:

(a).    <u>The Card Issuer</u> –  the company that issued the credit or debit card to the customer, which is typically a bank such as Chase or Bank of America, and which charges a fee whenever a customer uses one its cards for a transaction.  These companies charge fees that are usually calculated as a percentage of a transaction plus a per-transaction fee (e.g., 1.65% + $0.20/transaction).  This fee varies based on the type of card used.  For example, the card issuing companies will charge a higher fee for transactions involving a rewards credit card than a card with no rewards program.  These fees are generally known as "interchange rates."

(b).    <u>The Card Association</u> – the card associations (i.e., Visa, MasterCard, and Discover) also charge per transaction fees.  By way of example, Visa assesses a fee known as the "APF" ("Acquirer Processing Fee"), and MasterCard charges a fee known as the "NABU" ("Network Access Brand Usage") fee.  The card networks also charge various additional fees depending on the type of transaction.  These fees are generally known as "assessments."

(c).    <u>The Payment Processor</u> – this is the entity that actually processes the payment through the card network and ensures that whenever a customer pays for an item or service with a credit or debit card, the customer's account is debited and the merchant's account is credited.  During the relevant time period, CPAY has used Total System Services, Inc. and its subsidiaries (collectively, TSYS) as its payment processor.  TSYS has been an owner of CPAY at all relevant times and now owns at least 75% of the company.

(d).     The Member Bank – only banks may be members of card associations.  These member banks "sponsor" merchant acquirers and payment processors so they may process transactions through the card associations.  During the relevant time period, CPAY has been sponsored by First National Bank of Omaha and Wells Fargo.

(e).     The Merchant Acquirer – this is the company that markets the payment processor's services to merchants.  Merchant acquirers essentially act as a "middle man" between merchants and payment processors.  They enroll merchants in payment processing services and usually provide customer support to the merchant.  Merchant acquirers usually work with independent sales agents who sign up merchants.  The merchant acquirer then pays the agent based on a percentage of the processing fees obtained from "their" merchants.  CPAY is a merchant acquirer and aggressively seeks to enter relationships with independent sales agents to sign up merchants on its behalf.

5.     Ordinarily, a merchant that desires to accept credit and debit cards as a form of payment reaches agreement with a merchant acquirer (or its independent sales affiliates) to obtain such services.  The parties agree on the fees that the merchant will be charged, which commonly consist of two parts:

(a).     "Pass Through" Costs – these charges consist of fees imposed by card issuers and the assessments imposed by card associations.  These are set costs incurred by the member bank that apply universally at any given time, regardless of the type or amount of the transaction or the identity of the merchant.  These costs are set, unavoidable, and are "passed through" to the merchant.

(b).    Payment Processing Fees – these are the fees which the merchant is charged by the merchant acquirer for payment processing services.  These fees are not uniform but can be varied or negotiated by the parties.

6.    The number of involved parties and moving pieces can make it difficult for merchants to understand whether they are only being charged agreed-upon fees.

7.    Unfortunately, CPAY takes advantage of this confusion by having its agents induce small, "mom and pop" merchants like Plaintiffs to execute a standardized CPAY "Merchant Processing Application & Agreement" ("Application") with the promise of straightforward, transparent pricing.

8.    The fine print "Terms and Conditions" ("Terms") that Defendant intends to largely govern the relationship are set forth in a separate document.   In this way merchants see and execute one document that prominently displays the agreed-upon rates and fees, but are purportedly also bound by another document.  Through the separate, fine print Terms, Defendant seeks to (a) backtrack from the agreed-upon fees and rates that have actually been reviewed and approved by the merchant and (b) immunize itself and its processing partners from liability if the merchant discovers and takes issue with Defendant's deviation from the agreed-upon pricing. Such provisions are illusory, exculpatory, lack mutuality, violate public policy, and are unconscionable.

9.    After merchants sign the contracts and the parties begin to do business, Defendant implements mark-ups by inflating both "pass through" costs and agreed-upon payment processing fees and imposing new junk fees.

10.    CPAY furthers its scheme through a number of techniques, such as by seizing the charged amounts from merchant bank accounts before merchants receive billing statements

4

which include such charges and using deceptive language in such statements to lead merchants to believe increases are being mandated by card associations, as opposed to being imposed merely to pad Defendant's bottom line.

11.     Defendant's overcharges are in direct breach of the contract and also violate the covenant of good faith and fair dealing.

12.     Any arguments by Defendant that the excessive fees and charges are authorized by the self-serving, adhesive Terms referenced in paragraph 8 above, are without merit because such terms are inapplicable and unenforceable.

13.     Defendant's mark-ups are assessed for the sole purpose of raising additional revenue at the merchant's expense.  The challenged fees do not result from higher than anticipated costs suffered by CPAY.  Rather such additional revenue goes straight to the bottom line as more profit.

14.     For several years, Defendant has perpetrated this overbilling scheme.  This case challenges the nature and amount of fees that Defendant imposes.

## **PARTIES**

15.     Plaintiff Hair Designs by Sandy, LLC ("Sandy") is a Florida limited liability company that specializes in hair styling and other cosmetology services.  It is owned and operated by Sandra Carrano and uses a legal address in Palm Beach Gardens, Florida.  Sandy was a payment processing customer of CPAY from approximately November 2015 through February 2017.

16.     Plaintiff Skip's Precision Welding, LLC ("Skip's") is an Arizona limited liability company that specializes in providing welding services.  It is owned and operated by Thomas

"Skip" Payne and is located in Kingman, Arizona.  Skip's was a payment processing customer of CPAY from approximately July of 2016 through February of 2017.

17.     Defendant CPAY is a Delaware limited liability company that is headquartered in San Rafael, California.  According to its website, CPAY provides payment processing services to over 65,000 businesses and processes over $10 billion in credit card sales annually.  CPAY may be served with process via its registered agent – CT Corporation System, 5601 S. 59th Street, Lincoln, Nebraska 68516.

## JURISDICTION AND VENUE

18.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d)(2) because there are more than 100 potential class members and the aggregate amount in controversy exceeds $5 million exclusive of interest, fees, and costs, and at least one class member is a citizen of a state other than Nebraska.

19.     This Court has personal jurisdiction over CPAY because it is registered to transact business in Nebraska and has engaged in a continuous and systematic course of doing business in Nebraska by offering its services to thousands of Nebraska citizens and companies.

20.     Venue lies within this judicial district under 28 U.S.C. § 1391 because Defendant conducts substantial business in this district and a substantial portion of the events, omissions, and acts giving rise to the claims herein occurred in this district.

21.     Venue and jurisdiction are also proper in this Court pursuant to Section 13.2 of the Terms which mandates that the litigation of disputes related to the Application and Terms occur in "the courts of Douglas County, Nebraska."  Plaintiffs would much prefer to litigate this case elsewhere, such as Florida or Arizona, but does not wish to fight about the enforceability of CPAY's venue provision.

## COMMON FACTUAL ALLEGATIONS

**A.**     **History of CPAY.**

22.     CPAY was founded by twin brothers Zachary and Matthew Hyman.

23.     The Hyman brothers got their start in business with a company called Productive Marketing, Inc. ("PMI").  PMI marketed and sold guide materials for auctions of foreclosed homes and repossessed vehicles.

24.     In June of 2000, the Federal Trade Commission ("FTC") filed a complaint against PMI and the Hyman brothers alleging that they committed numerous deceptive and fraudulent practices in connection with PMI's business activities, including:  debiting or charging consumer checking and credit card accounts without authorization; charging consumers for two sets of materials even if consumers had only authorized the charge for one set or none; failing to disclose material conditions and restrictions of their refund policy; and making false and unsubstantiated claims about late model cars sold at public auto auctions.

25.     In response to the FTC's complaint, the United States District Court for the Central District of California issued a temporary restraining order and froze PMI and the Hyman brothers' assets.

26.     The charges were subsequently settled.  As part of the settlement, PMI and the Hyman brothers were permanently barred from advertising, marketing, offering for sale, or selling information guides, and were required to pay a total of $180,000 in consumer redress.

27.     After being barred from marketing and selling information guides, the Hyman brothers switched their business pursuits to the payment processing industry.

28.     In or about 2000, they founded a company called CardPayment Solutions, Inc. ("CPS"), a merchant acquiring business.  CPS quickly became notorious for bad practices in the

card payment industry.  Common complaints about CPS were that its agents failed to disclose the true processing fees at the outset of a relationship and then provided poor customer service when merchants complained about these higher-than-quoted fees.

29.     The Hymans sold CPS in or about 2003 to iPayment for $18 million.  As part of that transaction, they were forced to sign a two-year non-compete agreement, promising not to open another business in the same field.

30.     When the non-compete expired in 2005, the Hymans formed CPAY, a merchant acquiring business catering to small and mid-sized merchants.

31.     At or about that time, CPAY began to sign up merchants for Wells Fargo and First National Bank of Omaha and contracted to have TSYS process its merchant customer transactions.

32.     CPAY grew rapidly and from 2009 to 2012 was named by *Inc.*, a business magazine, as one of the country's fastest growing companies.

33.     By August of 2012, CPAY had acquired 40,000 merchants, was handling roughly $3.5 billion in card transactions per year, and was valued at approximately $125 million.  At this time, the Hymans sold a 60% controlling stake in CPAY to its processor partner, TSYS.  The acquisition price was not disclosed.

34.     In February of 2014, TSYS acquired an additional 15% of CPAY, bringing its total ownership stake to 75%.  At this time, CPAY was valued at $250 million.  The acquisition price was not disclosed.

35.     CPAY's rapid growth is due in large part to the thousands of independent sales agents it has retained to aggressively market CPAY's services.  These agents are generally paid as a percentage of the fees that are ultimately charged to merchants.

36.     Because they are not paid unless a merchant signs up, agents will do and say virtually anything to get merchants to contract with CPAY.  Many small business-oriented websites have multiple pages filled with similar complaints from merchants that CPAY agents misled them, failed to disclose important contract terms, or outright lied to them.

**B.**     **CPAY Induces Merchants to Do Business with Promises of Low Cost Pricing.**

37.     Via its agents, CPAY approaches and markets to merchants in an attempt to induce them to switch to Defendant's services through promises of transparent, low cost pricing. Merchants are attracted by promises of being able to save money by reducing the costs they would pay for payment processing services if they switched providers.  This approach is very appealing to merchants because payment processing is a substantial business expense for them.

38.     CPAY provides prospective merchants with the form Application.

39.     The member bank (i.e., either Wells Fargo or First Bank of Omaha) ("Bank") is also a party and signatory to the Agreement.  Since the Bank is not known to have participated in the improper conduct alleged herein it has not been named as a defendant.

40.     The Application identifies the payment processing fees to which the merchant will be subject if it decides to enroll in Defendant's services.  In the Application's Fee Schedule, merchants are informed of the applicable payment processing fees.

41.     The Application first describes the pricing method.  Under "tiered pricing" pricing, merchants agree to pay a specified amount for each type of card transaction with such amount being calculated as a percentage of a transaction plus a per-authorization fee.  Another option is "interchange plus" or, as Defendant calls it, "pass-through pricing" where customers pay the actual rates of the card networks plus a specified mark-up for CPAY.

42.     In addition to the pricing method, the Application also specifically identifies other miscellaneous fees (both periodic fees and per occurrence fees) to which the merchant will be subject.

43.     Finally, the Application notes that the merchant will be subject to certain card association fees and such fees will be passed through to the merchant at the standard card association rates.

44.     The Application thus informs the merchant in clear, unambiguous terms what it will be charged if it agrees to enroll in Defendant's services and how such charges would be calculated.   This transparency is very important to merchants, especially to those whose agreements extend for a set period of time, typically three years.   If a merchant on a set term desires to end its relationship with Defendant prior to the expiration of this term, it often must pay an early termination fee of between $300 and $550.

**B.      CPAY Buries Absurd Provisions in the Fine Print of the Terms that Purport to Allow It to Charge Whatever It Wants Without Fear of Legal Action.**

45.     The Application itself does not indicate that (a) the agreed-upon fees and rates will increase (nor would increases be expected since technology and competition has actually driven down costs for payment processing) or (b) new, undisclosed fees and rates will be charged.   Such terms unquestionably are important to merchants and would influence their decision to do business with Defendant.

46.     Instead of conspicuously setting forth such critical provisions in the Application, Defendant buries them in the separate and non-negotiable Terms.

47.     In very fine print, the Application states that the merchant is obligated to the separate Terms.   *E.g.*, Exh. C, p. 3.   Given the dense legalese of the Terms, which are spread over 35 pages, there is zero chance that a merchant could actually read or understand it.   Notably,

Chief Justice John Roberts, Judge Richard Posner, and other federal judges have stated that they do not read – and are aware that no one reads – fine print form contracts.

48.     The Terms are a boilerplate document that is not negotiable.  *See* Terms, § 13.9 ("Any alteration or strikeover in the text of this pre-printed AGREEMENT will have no binding effect and will not be deemed to amend this AGREEMENT").

49.     Several provisions set forth in the Terms represent an effort by Defendant and its partners to (a) covertly backtrack from the rates and fees prominently set forth in the Application and (b) immunize the Bank and TSYS from liability for improper practices.

50.     The Terms include clauses purporting to:

(a).     give the Bank (but not CPAY or TSYS) broad discretion to change the amounts of agreed-upon fees or impose whatever new fees it desires immediately and without notice (*id.* at §§ 3.1 – 3.5);

(b).     limit the Bank's liability for overcharges to a maximum of one month's worth of processing fees (excluding pass through charges) (*id.* at § 10.1);

(c).     require merchants to notify the Bank of "any error or discrepancies detected by MERCHANT in writing to BANK within ninety (90) days following the end of any monthly reporting period" as a hurdle to the pursuit of legal claims against the Bank (*id.* at § 7.5);

(d).     reduce the statute of limitations for all claims against the Bank to one year (*id.* at § 13.3);

(e).     require all cases to be filed in Nebraska pursuant to Nebraska law (*id.* at § 13.2);

(f).     prohibit merchants from enforcing their right to a jury trial (*id.* at § 13.3); and

(g).     prohibit merchants from pursuing a class action against the Bank (*id.*).

51.     Defendant uses these provisions, as well as a hefty early termination fee (Application; Terms, § 5.2(C)), as tools to discourage aggrieved merchants from terminating their relationships with CPAY or pursuing legal action for overcharges.

52.     Several of the provisions highlighted above, and others, violate public policy, lack mutuality, are unconscionable, and are otherwise void and unenforceable.

**C.     Defendant Raises Fees and Imposes New Categories of Fees Not Reflected in the Application.**

53.     After CPAY begins servicing merchants, almost immediately it begins increasing charges and cramming merchants with fees that are inconsistent with the agreed-upon charges that are prominently set forth in the Application.

54.     Indeed, Defendant increases the applicable rates, miscellaneous fees, and card association rates that are supposed to be passed through at cost.  CPAY also invents and charges new fees that are not mentioned in the Application.

55.     CPAY and its agents know that if they disclosed these substantial fees in the Application or on the front end of the relationship, merchants would be much less likely to leave their then-current processor to do business with them.  Instead, CPAY crams merchants with these unanticipated fees after the relationship has commenced and merchants are "locked in."

56.     CPAY describes its fees in a very misleading fashion so as to preclude merchants from realizing the fees are improper or that CPAY, as opposed to the card associations, is responsible.

57.     CPAY seizes these additional amounts from merchant bank accounts before merchants even know they are gone.  Even if merchants could effectively decipher Defendant's amorphous monthly statements, by the time merchants receive such statements, Defendant has already debited the improper amounts from merchant bank accounts.

## INDIVIDUAL FACTUAL ALLEGATIONS

**A.      CPAY Overcharges Plaintiffs.**

*Sandy.*

58.      In or about October of 2015, Sandy was renting a chair to perform hair-styling services from a beauty salon known as "Salon Bella" in West Palm Beach, Florida.  At that time, stylist contractors such as Sandy were required by Salon Bella management to process their customers' credit card payments through CPAY.

59.      The CPAY agent assigned to Salon Bella was "Adam."  Sandy was given the Application and clearly informed that her relationship with CPAY would be "month to month" and could be terminated at any time on 30 days notice.

60.      The Application specifically identified the agreed-upon fees and rates Sandy would be charged for processing customer card payments through CPAY.

61.      According to the Application, for each card transaction Sandy would pay $0.22 cents and a percentage of the transaction ("discount rate"), as follows:

| | |
|---|---|
| Check Card Rate | 0.9% |
| Qualified Rate | 1.7% |
| Mid-Qualified Rate | Qual. (1.7%) + 1.3% = 3.0% |
| Non-Qualified Rate | Qual (1.7%) + 0.8% = 2.5% |

62.      Sandy was also to pay standard card association fees, which were to be "passed through" at cost.

63.      Finally, Sandy was to pay a number of miscellanous fees.  For example, the Application notes (a) a monthly statement fee of $9.50, (b) a "batch fee" of $0.25 cents, (c) a PCI annual compliance fee of $85.00, and (d) a monthly non-compliance fee of $23.95.

64.     Sandy executed the Application and thereafter commenced to process her customers' card payments through CPAY.

65.     Over the course of its relationship with Sandy, CPAY charged fees that did not comport with those set forth in the Application.  These fee manipulations generally fall into four categories.

66.     First, CPAY inflated the agreed discount rates.  Specifically, in April of 2016, CPAY inflated each applicable discount rate by eight basis points.  For example, rather than charging Sandy 0.9% for check cards, CPAY charged it 0.98%.

67.     Second, CPAY inflated card association fees.  Indeed, rather than pass through such amounts at cost as required by the Application, CPAY inflated them.  By way of example only, in August of 2016, CPAY began charging Sandy a monthly MasterCard location fee of $1.50.  Given that the standard "pass through" charge for this fee is actually $15.00/year per payment terminal (which was shared by numerous co-workers of Sandy), the fee charged to Sandy was grossly inflated.

68.     CPAY almost certainly inflated other card association fees.  However, CPAY has intentionally formatted its monthly statements so as to make it impossible for Sandy and other merchants to make this determination.  Indeed, rather than break out the amount charged for each applicable card association fee, CPAY aggregates most such fees into one line item, called "PASSTHRU FEES."  Because CPAY fails to breakdown which card association fees were charged (and the amount charged for each), Sandy and other customers cannot possibly determine how much was being improperly added to their bills.

69.     Third, CPAY added a new discount rate that Sandy never agreed to pay.  Indeed, in April of 2016, CPAY began charging Sandy a "TSSNF FEE" of seven basis points of total processing volume (0.07%).  This fee is mentioned nowhere in the Application.

70.     To make matters worse, CPAY aggregated this fee with the "PASSTHRU FEES" on monthly statements.  This formatting maneuver not only made it difficult to calculate the true amount of the "TSSNF FEE" but made it seem to customers as though the fee was another "pass through" charge coming from the card associations.  In reality, it was just another fee added by CPAY to increase its bottom line profit.

71.     Fourth, CPAY charged Sandy higher "junk fees" than those listed in the Application.  For example, although the Application discloses a "PCI Annual Compliance Fee" of $85, in January of 2017 CPAY charged Sandy $99.50 for such a fee, an overcharge of $14.50.

72.     These descriptions are intended only as illustrations of CPAY's overcharges. Sandy is not in possession of complete information as to many of the charges imposed upon them.  Discovery will likely reveal other examples of Sandy being overcharged.

73.     Merchants that were overbilled for these and other improper fees were disincentivized from terminating their relationship with CPAY.

74.     For example, in September of 2016, Sandy contacted CPAY and provided 30 days notice that she was leaving her chair at Salon Bella and thus terminating the relationship.

75.     Although Sandy's relationship with CPAY was supposedly month to month, CPAY nonetheless removed $375.00 from Sandy's bank account for what it called an early termination fee.

76.     Upon learning of the fee, Sandy contacted CPAY to complain, insisting she was on a month to month deal and no early termination fee should have been charged.  The CPAY

representatives responded by encouraging Sandy to continue using its services at the new salon. Sandy agreed to continue using CPAY so the $375.00 early termination fee would be credited back to her account.

77.     Clearly, CPAY had no basis to charge the early termination fee in the first place but used it as a means to compel Sandy to continue the relationship.

78.     Sandy finally became so fed up with CPAY's overbilling that it terminated the relationship for good in or about February 2017.

***Skip's.***

79.     In or about July of 2016, Skip's was approached by a CPAY representative named Thomas Newman, who presented him with an Application.

80.     The Application specifically identified the agreed-upon fees and rates Skip's would be charged for processing customer card payments through CPAY.

81.     According to the Application, for each card transaction Skip's would pay $0.10 cents and a discount rate, as follows:

| | |
|---|---|
| Check Card Rate | 1.0% |
| Qualified Rate | 1.75% |
| Mid-Qualified Rate | Qual. (1.75%) + 1.0% = 2.75% |
| Non-Qualified Rate | Qual (1.75%) + 1.75% = 3.5% |

82.     Skip's was also to pay standard card association fees, which were to be "passed through" at cost.

83.     Finally, Skip's was to pay a number of miscellaneous fees.  For example, the Application notes a monthly statement fee of $9.50, a "batch fee" of $0.25 cents, a PCI annual compliance fee of $95.00, and a monthly non-compliance fee of $23.95.

84.     Skip's executed the Application and thereafter commenced to process customer card payments through CPAY.

85.     Over the course of its relationship with Skip's, CPAY charged fees that did not comport with those set forth in the Application.

86.     For example, just as it did with Sandy, CPAY inflated card association fees.  By way of example only, in September of 2016, CPAY began charging Skip's a monthly MasterCard location fee of $1.50.  Given that the standard "pass through" charge for this fee is actually $15.00/year per payment terminal, the fee charged to Skip's was inflated.

87.     CPAY almost certainly inflated other card association fees.  However, CPAY has intentionally formatted its monthly statements so as to make it impossible for Skip's and other merchants to make this determination.  Indeed, rather than break out the amount charged for each applicable card association fee, CPAY aggregates most such fees into one line item, called "PASSTHRU FEES."  Because CPAY fails to breakdown which card association fees were charged (and the amount charged for each), Skip's and other customers cannot possibly determine how much was being improperly added to their bills.

88.     As was the case with Sandy, CPAY added a new discount rate that Skip's never agreed to pay.  Indeed, in December of 2016, CPAY began charging Skip's a "TSYS NETWORK FEE" of seven basis points of total processing volume (0.07%).  This fee is mentioned nowhere in the Application.

89.     CPAY charged Skip's higher "junk fees" than those listed in the Application.  For example, although the Application discloses a "PCI Annual Compliance Fee" of $95, in January of 2017 CPAY charged Skip's $99.50 for such a fee, an overcharge of $4.50.

90.    In December of 2016 and January of 2017, CPAY also charged Skip's a $7.95 "CARD COMPROMISE ASSIST PLAN" fee.  CPAY charged this fee despite the Application noting that it was "optional" for all merchants who were PCI compliant.  Skip's was PCI compliant during these months and never opted in to such a fee.

91.    CPAY also charged Skip's a "PCI NON-COMPLIANCE FEE" of $15.95 and the associated "CARD COMPROMISE ASSIST PLAN" fee of $7.95 in September of 2016.  The Application, however, states that such fees cannot be charged for the first two months of the Agreement, which was signed on July 28, 2016.

92.    CPAY deducted $813.36 from Skip's bank account on the September 2016 statement for "OTHER FEE ADJUSTMENT."  This massive deduction violated the contract.

93.    Skip's became fed up with the overcharges and CPAY's refusal to forward amounts due from Skip's customers.  These problems and Defendant's poor customer service and nonresponsiveness led Skip's to terminate the relationship in or about February of 2017.

94.    As a consequence of CPAY's overbilling policies and practices, Plaintiffs and the proposed class have been wrongfully forced to pay unauthorized fees and charges.  Defendant has improperly deprived Plaintiffs and those similarly situated of significant funds, causing ascertainable monetary losses and damages.

**B.**     **The Anticipated Defenses Have No Merit.**

*Voluntary Payment.*

95.     CPAY may respond by claiming that Plaintiffs voluntarily paid the charges of which they now complain and recovery is thus barred by the voluntary payment doctrine. However, the voluntary payment doctrine does not apply.

96.     By the time Plaintiffs received Defendant's monthly statements, Defendant had already seized the charges noted therein from Plaintiffs' bank accounts.  This is Defendant's general practice – to send statements so that they are not received by merchant customers until after Defendant is already in possession of the fees.  Because the fees are taken before merchants are notified or have a reasonable opportunity to understand how they were computed, it cannot be said that Plaintiffs have "voluntarily" paid them with full knowledge of the facts.

97.     Even if Plaintiffs had received the statements in a timely fashion, this is not a simple case where readily accessible information would have easily put Plaintiffs on notice they were being overcharged.

98.     First, the statements mix "pass through" fees with those imposed solely by CPAY. Thus, determining whether a fee should be checked against the Application or the "pass through" fee schedules published by the card associations is often impossible.

99.     Moreover, a single credit card transaction often involves many different fees, making it even more difficult to determine whether Plaintiffs have been overcharged for "pass through" fees.

100.    Furthermore, the statements use terminology that differs from that contained in the Application.  For instance, rather than referring to discount rates by the names assigned in the Application (i.e., "Check Card Rate," "Qualified Rate", "Mid-Qualified Rate," and "Non-

Qualified Rate") the statements refer to rates by numerical tiers (i.e., "Rate 1," "Rate 2," "Rate 3," and "Rate 4") without providing any clarifying explanation. This discrepancy makes determining overcharges impossible.

101.   Even if merchants could successfully match the rate tiers to the Application, the statements provide no information as to why a transaction was assigned to a certain tier. For example, Sandy had no way to determine whether the $30.00 credit card sale on March 6, 2016, was properly assigned to the "Rate 2" tier, as the statement reflects. In general tiered pricing is known to be a scam in the card payment industry, with nearly every card type failing to qualify for the lower "qualified rate" based only on the discretion of the payment processor. For example, CPAY utilized tiered pricing to charge astronomical rates, such as in excess of 3% when the pass-through rate would only be 1.65%. This mechanism provides massive, unearned profits for CPAY.

102.   Additionally, CPAY often buries language in monthly statements purporting to raise or vary the charges noted in the Application. Thus, to determine if it was being overcharged, Plaintiffs would arguably have to check the charges against every prior monthly statement (in addition to the Application and the card association fee schedules).

103.   Plaintiffs anticipate presenting evidence from industry experts that it is extraordinarily difficult for merchants to understand invoices from payment card processors, which are in many ways even more incomprehensible than the explanations of benefits sent to patients by health insurers. The amount of work needed by a merchant to understand the details of a payment card invoice, even if possible, can be extraordinary.

104.   Even if it can be said that Plaintiffs had the duty and capability to perform this onerous investigation in response to each and every monthly statement, failure to do so before

paying the subject amounts was, at worst, due to negligence or a lack of diligence.  Payments made under such circumstances can be recovered because it would not prejudice Defendant, which makes millions in profits each year, to return the overcharges.

### *"90-Day Notice" Provision.*

105.    CPAY may attempt to invoke Section 7.5 of the Terms, which states

> MERCHANT is supplied with monthly reports by BANK regarding MERCHANT's SALES or SERVICES activity.  It is MERCHANT'S sole responsibility to report any error or discrepancies detected by MERCHANT in writing to BANK within ninety (90) days following the end of the monthly reporting period.  After such period, MERCHANT will be deemed to have accepted the monthly reports as delivered.

106.    This provision is inapplicable for multiple reasons.  First, the term "error or discrepancies" as used herein clearly refers to factual mistakes that are best addressed while information and facts are easily remembered.  This case does not address mistakes at all, but rather only CPAY's willful efforts to improperly raise fees and charges.  Unlike a mistaken transaction – where a customer was charged $100 rather than $10, for example – Defendant's intentional and systematic markups and overcharges can be dealt with after-the-fact.

107.    Indeed, interpreting the 90-day notice provision more broadly to include Defendant's systematic overcharges within the scope of the term "error or discrepancies" would only serve to exculpate CPAY from liability if merchants failed to "catch it in the act" soon after the overbilling occurs.

108.    Moreover, the provision only applies to "any error or discrepancies *detected by MERCHANT*."  As shown above, Sandy, Skip's, and other merchants were precluded by Defendant's deceptive practices and cryptic statements from detecting that they were being overcharged.

109.    Defendant cannot properly cram and bury improper charges under these circumstances and then try to use the notice provision as a shield against liability for their willfully deceptive and unfair conduct.

110.    Regardless, the 90-day notice provision is an invalid exculpatory clause. Exculpatory clauses are contractual provisions severely restricting remedies or waiving substantial rights.  Here, the written notice provision, if interpreted as Defendant is likely to suggest, would severely restrict remedies and insulate Defendant from liability and is thus an exculpatory clause.

111.    To be enforceable, the written notice provision must be explicit, prominent, clear, and unambiguous.  There is nothing about this provision that effectively and sufficiently distinguishes it from the dozens of other provisions in the lengthy, small-type Terms.  Rather it is buried in the middle of the Terms.  The provision was effectively designed to draw as little attention as possible.  It is thus unenforceable.

112.    The 90-day notice provision is also unconscionable.  Indeed, the process by which Defendant "made" its contracts with Plaintiffs is unconscionable.  Defendant is a large merchant acquirer while Plaintiffs are small, "mom and pop"-type merchant.  Plaintiffs must accept debit and credit cards to make themselves competitive in the marketplace and thus must use a payment processing service.  They are thus at the mercy of companies such as Defendant that provide such services.  Defendant has taken full advantage of this fact by imposing the decidedly one-sided Terms on Plaintiffs without negotiation or the ability to "opt out" of disfavored provisions. *See* Terms, § 13.9.  This "take-it-or-leave-it" process meant Plaintiffs were forced to sign the Application and accept the separate Terms as-is.  Moreover, on its face the written notice

provision is inconspicuous and difficult to comprehend.  Under these circumstances, the subject provision is procedurally unconscionable.

113.    The written notice provision is substantively unconscionable because if enforced in a strained manner that may be suggested by CPAY it would be grossly unfair in that it would have the practical effect of condoning Defendant's intentional overbilling practices.  There are many problems with the misleading statements, which given their form and the generally confusing nature of the card processing system, do not effectively place merchants on notice that they are being overbilled.  It would be grossly unfair to expect another to "eat" their losses if he does not even realize he is being overbilled and a fair minded man would never agree to such a restriction.

*Class Waiver.*

114.    CPAY may attempt to make use of Section 13.3 of the Terms, which states in pertinent part:

> MERCHANT ALSO COVENANTS NOT TO BRING OF PARTICIPATE IN ANY CLASS ACTION AGAINST BANK BASED UPON ANY CLAIMS ARISING FROM THIS AGREEMENT.  IF A CLASS PROCEEDING IS INITIATED AGAINST BANK, MERCHANT MAY NOT JOIN THE PROCEEDING OR PARTICIPATE AS A MEMBER OF THE CLASS.

115.    This provision is clearly inapplicable because it only applies to class actions brought against "BANK."  Plaintiffs do not assert any claims against their Bank (First National Bank of Omaha).

116.    However, even if CPAY had been included in the provision, the clause is plainly unenforceable.

117.    The "class waiver" is an exculpatory clause because it severely restricts, if not eliminates, Plaintiffs' remedies and thus effectively insulates Defendant from liability.  Indeed, if Plaintiffs are forced to seek relief on an individual basis, it would make no economic sense for

them to proceed with this case.  Because the contract purportedly does not allow Plaintiffs to recover attorneys' fees if their claims are vindicated and may limit what Plaintiffs can recover (Terms, § 10.1), the costs of litigating the case to conclusion would far outweigh the potential damages at stake.  Thus, the only practical way to remedy Defendant's small-value overbilling is by a class action.  *See generally Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("The realistic alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30").

118.    The class action waiver is also an improper exculpatory clause because (a) it is not explicit, prominent, clear, and unambiguous and (b) Plaintiffs allege Defendant's overcharges were imposed willfully and wantonly, as opposed to via mistake or negligence.

119.    The waiver is also unconscionable.  It is procedurally unconscionable given the way it was presented in the Terms and for the reasons set out above as to other sections.

120.    The waiver is also substantively unconscionable because it is grossly unfair in that it allows Defendant to steal small amounts with impunity.

### *Other Contractual Provisions.*

121.    CPAY may attempt to defend its conduct by arguing that it had the contractual discretion to amend the Application to increase fees or impose new fee categories.  *See* Terms, §§ 3.1 – 3.5.  However, such discretion clearly is only given to the Bank, not CPAY.

122.    Moreover, while that language may, for example, allow for increases or reductions in "pass through" fees required by the card associations, any expansive construction of this language that would allow CPAY to charge whatever it wants is improper.  Under such an interpretation, Defendant could, arbitrarily, for any reason or no reason at all, and without procuring agreement from merchants, increase any charge or fee by any amount, and could say

whatever it liked about the amounts collected, without breaching the contract. If that is the meaning of such "change in terms" provisions, then they are void for vaguenesss, illusory, and lack mutuality.

123. Even if the contract did not limit discretionary fee increases, good faith and fair dealing constrains Defendant's ability to use discretion to increase fees in ways which were not contemplated by the parties. For example, although a contract may leave discretion to increase a fee, and thereby profit one party to the other party's detriment, good faith and fair dealing precludes such conduct unless increased costs have necessitated the increase.

124. Thus, even if its purported ability to change rates is enforceable, CPAY is bound to exercise its contractual discretion in good faith. Defendant's manipulation of Plaintiffs' fees and charges was not done in response to actual cost increases. Such unilateral mark-ups to agreed-upon rates do not comport with good faith and fair dealing.

125. Defendant may also argue that its billing manipulations are proper because it provided Plaintiffs with advance notice of some changes. However, Plaintiffs were not provided with advance notice of many of the fee increases and new charges. Sandy, for example, was not provided with advance notice of the $99.50 PCI Annual Compliance Fee and Skip's was not provided with advance notice that it would be assessed the "CARD COMPROMISE ASSIST PLAN" fee even when it was PCI compliant. Moreover, the form, format, and content of the statement notices given by CPAY for some of the charges at issue were insufficient to provide Plaintiffs with actual notice of the increases and were therefore ineffective.

126. For example, the statement notices given to Sandy in February of 2016 for the April of 2016 fee increases, and to Skip's in October of 2016 for the December of 2016 increase,

are worded so as to create the false impression that the increases were mandated by the card associations (and not CPAY).

127.    The "change in terms" provisions are also procedurally unconscionable for the reasons expressed above as to other sections of the contract.

128.    The provisions are substantively unconscionable because they are grossly unfair. Indeed, no reasonable merchant would agree to a provision that allows a processor to disregard all agreed-upon pricing considerations (i.e., the considerations which induced the merchant to do business with the processor in the first place) and charge whatever, whenever, and for whatever reasons it wants.

129.    Defendant may also attempt to invoke Section 10.1's provision which purports to limit merchant damages to "the lesser of the direct loss to MERCHANT or any amount equal to the processing portion of the DISCOUNT paid to BANK by MERCHANT in the month prior to the incident giving rise to liability."   Again, however, this provision is only applicable to the Bank, not CPAY.

130.    This "limitation of liability" provision is an unenforceable exculpatory clause and procedurally unconscionable for the reasons expressed above.  It is substantively unconscionable because, if enforced, it would have the practical effect of immunizing Defendant from liability. Customers such as Plaintiffs simply cannot afford to pay attorneys to pursue only one month worth of payment processing charges (i.e., often less than a hundred dollars).   Moreover, attorneys have no incentive to take such cases on a contingency basis given the limited potential damages.  It would be grossly unfair to expect merchants to "eat" the vast majority of their losses if a breach of contract is proven.

131.    Defendant may also attempt to invoke Section 13.3's provision which purports to reduce the statutes of limitations for claims against the Bank to "one (1) year of the date the error or the incident giving rise to such action occurred."

132.    This provision is clearly only applicable to claims against the Bank, not CPAY.

133.    Regardless, this provision (which purports to reduce the applicable five-year statute of limitation for breach of contract to one year) is an unenforceable exculpatory clause and procedurally unconscionable for the reasons described above.  It is substantively unconscionable because, if enforced as written, it does not allow for equitable tolling and would unfairly bar suit by those customers who did not immediately discover Defendant's scheme.

134.    Plaintiffs' experiences with CPAY are not isolated, but rather are illustrative of Defendant's improper business practices towards its merchant customers.

## CLASS ALLEGATIONS

135.    Plaintiffs bring this action on behalf of themselves and all others similarly situated.

136.    The Class is preliminarily defined as:

All customers in the United States that paid a fee to Defendant that is higher than those set forth in the Merchant Processing Application & Agreement.

137.    Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate and as the Court may otherwise allow.

138.    Excluded from the Class are Defendant, its parents, subsidiaries, affiliates, officers, and directors, any entity in which Defendant has a controlling interest, all customers who make a timely election to be excluded, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

139.    The time period for the Class is the number of years immediately preceding the date on which the Complaint is filed as allowed by the applicable statute of limitations, going forward into the future until such time as Defendant remedies the conduct complained of herein. If the contractual choice of law provision is deemed binding, then Nebraska's five-year statute of limitations for breach of contract will be applicable to all Class members.

140.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can meet all the applicable requirements of Federal Rule of Civil Procedure 23 and can prove the elements of its claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

141.    *Numerosity*.  The members of the Class are so numerous that individual joinder of all the members is impracticable.  On information and belief, there are tens of thousands of merchants that have been damaged by Defendant's wrongful conduct as alleged herein.  The precise number of Class members and their addresses is presently unknown to Plaintiffs, but can readily be ascertained from CPAY's books and records.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, and/or published notice.

142.    *Commonality and Predominance*.  Numerous common questions of law and fact exist as to the claims of Plaintiffs and the other Class members.  Such questions include, but are not limited to:

(a).    Whether Defendant has breached its contracts with Plaintiffs and the other Class members, either directly or via the covenant of good faith and fair dealing;

(b).    Whether Defendant is liable to Plaintiffs and the other Class members for imposing unauthorized fees on merchants for Defendant's own benefit; and

(c).     Whether certain of the Terms are invalid exculpatory clauses, violate public policy, are illusory, lack mutuality, are procedurally and substantively unconscionable, and are otherwise void and unenforceable.

143.   Other questions of law and fact common to the Class include:

(a).     The proper method or methods by which to measure damages and/or restitution; and

(b).     Any declaratory and/or injunctive relief to which the Class is entitled.

144.   Defendant has engaged in a common course of conduct toward Plaintiffs and the other Class members.  The common issues arising from this conduct that affect Plaintiffs and the other Class members predominate over any individual issues.  Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

145.   *Typicality*.  Plaintiffs' claims are typical of the other Class members' claims because, among other things, all of the claims arise out of a common course of conduct and assert the same legal theories.  Further, Plaintiffs and members of the Class were comparably injured through the uniform misconduct described above.

146.   *Adequacy of Representation*.   Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class members; Plaintiffs have retained counsel competent and experienced in complex commercial and class action litigation; and Plaintiffs intend to prosecute this action vigorously.  Class members' interests will be fairly and adequately protected by Plaintiffs and their counsel.

147.   *Declaratory and Injunctive Relief*.  Defendant has acted or refused to act on grounds generally applicable to Plaintiffs and the other Class members, thereby making appropriate final injunctive and declaratory relief, as described below.  Specifically, Defendant

continues to knowingly overbill the Class and to enforce unconscionable or otherwise unenforceable contractual provisions in order to block the Class members from seeking legal relief. Class-wide declaratory and/or injunctive relief is appropriate to put an end to these illicit practices.

148. *Superiority*. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and each of the other Class members are small compared to the burden and expense that would be required to individually litigate their claims against Defendant, thus rendering it impracticable for Class members to individually seek redress for Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

### CLAIMS FOR RELIEF

### COUNT ONE
### Breach of Contract and Breach of the
### Covenant of Good Faith and Fair Dealing

149. Plaintiffs repeat paragraphs 1 through 148 above.

150. The actions taken by Defendant have materially violated the specific terms of its form Merchant Processing Application & Agreement.

151. Further, Defendant has breached the contract by violating the covenant of good faith and fair dealing. Defendant is liable for the losses of Plaintiffs and the Class that have resulted from its breaches of contract.

152.    Defendant violated the contract by assessing charges not provided for in the fee schedule in the Application and by unilaterally marking up agreed-upon fees and charges without proper basis.  Furthermore, Defendant has assessed other fees in the guise of "pass through" fees from the card associations which are actually retained by Defendant.  Thus, Defendant has materially breached the express terms of its own form contract.

153.    Plaintiffs and the Class have performed all, or substantially all, of the conditions precedent imposed on them under the contracts.

154.    Plaintiffs and the Class sustained damages as a result of Defendant's breaches of contract.

155.    Nebraska law imposes upon each party to a contract the duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute violations of good faith and fair dealing in the performance of contracts.

156.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified.  A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

157.    By charging fees that are inconsistent with those laid out in the contract, including but not limited to, increasing the amounts of agreed-upon fees and imposing new categories of fees not referenced in the contract, Defendant has violated the spirit of the contract and breached the covenant of good faith and fair dealing.  Even if Defendant believed that it had given itself

31

contractual discretion to increase mark-ups and fees, or add new fees, such discretion is constrained by good faith and fair dealing and Defendant's actions do not comport with this duty.

158.     Plaintiffs and the Class have performed all, or substantially all, of the obligations imposed on them under the contract.  There is no legitimate excuse or defense for Defendant's conduct.

159.     Defendant's anticipated attempts to defend its overbilling through reliance on contractual provisions in the Terms and elsewhere will be without merit.  Such provisions are either inapplicable or are unenforceable because they are void, illusory, lacking in mutuality, are invalid exculpatory clauses, violate public policy, and are procedurally and substantively unconscionable, among other reasons.  These provisions do not excuse Defendant's breaches or otherwise preclude Plaintiffs and the Class from recovering for such breaches.

160.     Plaintiffs and members of the Class sustained damages as a result of Defendant's direct breaches of the contract and Defendant's breaches of the covenant of good faith and fair dealing.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the proposed Class demand a jury trial on all claims so triable and judgment as follows:

1.     Certifying this case as a class action pursuant to Federal Rule 23;

2.     Temporarily and permanently enjoining Defendant from continuing the improper business practices alleged herein;

3.     Declaring certain contractual provisions to be unenforceable and enjoining their enforcement;

4.     Awarding restitution of all improper fees seized by Defendant from Plaintiffs and the Class as a result of the wrongs alleged herein in an amount to be determined at trial;

5.     Compelling disgorgement of the ill-gotten gains derived by Defendant from its misconduct;

6.     Awarding damages in an amount to be determined by a jury;

7.     Awarding compensatory, general, nominal, punitive, and exemplary damages, as allowed by law;

8.     Awarding pre-judgment interest at the maximum rate permitted; and

9.     Awarding such other relief as this Court deems just and proper.

### <u>DESIGNATION OF PLACE OF TRIAL</u>

Plaintiffs hereby designate Omaha, Nebraska as the place for trial of this action.

DATED this 21st day of August, 2017.

Respectfully submitted,

BY:    WAGSTAFF & CARTMELL, LLC

/s/ Tyler W. Hudson
Tyler W. Hudson
Missouri Bar No. 53585
Eric D. Barton
Missouri Bar No. 53619
Melody R. Dickson
Missouri Bar No. 61865
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
(816) 701-1100
thudson@wcllp.com
ebarton@wcllp.com
mdickson@wcllp.com


BY:    WEBB, KLASE & LEMOND, LLC

/s/ E. Adam Webb
E. Adam Webb*
Georgia Bar No. 743910

1900 The Exchange, S.E.
Suite 480
Atlanta, Georgia 30339
(770) 444-0773
Adam@WebbLLC.com

**Attorneys for Plaintiffs**

* Motion for *Pro Hac Vice* Admission to be filed
after case number assigned