| | |
|---|---|
| CUSTOM HAIR DESIGNS BY SANDY, LLC, on behalf of themselves and all others similarly situated; and SKIP'S PRECISION WELDING, LLC, on behalf of themselves and all others similarly situated;<br><br>        Plaintiffs,<br><br>   vs.<br><br>CENTRAL PAYMENT CO., LLC,<br><br>        Defendant. | **8:17CV310**<br><br><br>**MEMORANDUM AND ORDER** |

This matter is before the Court on multiple motions: request for class certification, Filing No. 89, filed by plaintiffs; motion to strike testimony of Karl J. Borden filed by defendant, Filing No. 99; motion for summary judgment filed by defendant, Filing No. 117; and motion to strike evidence filed by defendant, Filing No. 129.

**BACKGROUND**

Plaintiffs are merchants that processed credit and debit transactions through defendant Central Payment Co., LLC (CPAY). CPAY processes over 65,000 businesses and over $10 billion in credit sales annually. Plaintiffs contracted with CPAY from November 2015 through February 2017 for payment processing services. Plaintiffs allege that CPAY charged fees for its payment processing services that do not coincide with the terms of plaintiffs' merchant agreements and Terms and Conditions. Plaintiffs plead this case as a putative nationwide class action and argue that CPAY is a multi-year, interstate, multi-million-dollar scheme to defraud unsophisticated merchants. Defendants argue that this is a simple breach of contract case. CPAY allegedly altered the credit card discount

rates which changed the individual accounts by a few dollars a month, but on a national level, such scheme applied to over 200,000 national accounts. Although CPAY did not incur these fees in its role with merchants, it allegedly increased the fees, which were not authorized under contract, forcing the plaintiffs to pay more.

Those affected by the alleged scheme include: Bank: During the class period, it was First National Bank of Omaha (FNBO); Major credit card company: Visa, Mastercard, etc.; Credit card processing company: During the class period, it was TSYS; Merchant acquirer: CPAY; and, Merchants: CPAY's customers. TSYS has owned CPAY since April 2018. CPAY used "independent contractors" who get commission for each signed customer. The "independent contractors" also receive training information.

### STANDARD OF REVIEW

"Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."' *Foster v. BNSF Ry. Co.*, 866 F.3d 962, 966 (8th Cir.2017) (quoting Fed. R. Civ. P. 56(a)). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action."' *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

"The movant bears the initial responsibility of informing the district court of the basis for its motion, 'and must identify those portions of the record] . . . which it believes demonstrate the absence of a genuine issue of material fact."' *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042, (8th Cir. 20ll) (en banc) (quoting *Celotex*, 477 U.S. at 323). If the movant meets the initial burden, "the nonmovant must respond by submitting

evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.'" *Torgerson*, 643 F.3d at 1042 (quoting *Celotex*, 477 U.S. at 324).  "The nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Torgerson*, 643 F.3d at 1042 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).  "The mere existence of a scintilla of evidence in support of the [nonmovant' s] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Barber v. CI Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.5. 242, 252 (1986)).

## DISCUSSION

I.      *Filing No. 89, request for class certification*

Plaintiffs move to certify a class of merchants who suffered financial losses due to the alleged scheme by CPAY from January 1, 2010 to the present.[1]  This class, contends plaintiffs, have suffered damages in excess of $100 million, although each individual's damages do not justify separate actions.  Plaintiffs contend that there are four practices that apply to the named plaintiffs and to the potential class plaintiffs.  They include: TSSNF Fee; PCI Noncompliance Fee; raising discount rates; and Tier shifting. Plaintiffs contend all of these practices have common evidence.

---

[1] The Proposed Class is defined as follows:
> "All of CPAY's customers that, from January 1, 2010, to the present (a) were assessed the TSSNF Fee (a/k/a TSYS Network Fee); (b) were assessed the PCI Noncompliance Fee; (c) had their contractual credit card discount rates increased above their contractual rate by CPAY; and/or (d) had credit card transactions shifted by CPAY from lower-cost rate tiers to higher-cost rate tiers." Filing No. 89 at 1.

Class actions are designed for "eliminating the possibility of repetitious litigation and providing small claimants with a means of obtaining redress for claims too small to justify individual litigation." *DeBoer v. Mellon Mortgage Co.*, 64 F.3d 1171, 1175 (8th Cir. 1995) (citation omitted). A class action "saves the resources of both the courts and the parties by permitting an issue potentially affecting every class member to be litigated in an economical fashion[.]" *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 155 (1982) (quotations and modifications omitted). The district court may grant certification only after conducting a "rigorous analysis" confirming that the requirements are met. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.*

Rule 23 of the Federal Rules of Civil Procedure governs the requirements for establishing and maintaining certification for a class action lawsuit. "In order to obtain class certification, a plaintiff has the burden of showing that the class should be certified and that the requirements of Rule 23 are met." *Coleman v. Watt*, 40 F.3d 255, 258-59 (8th Cir. 1994).

Rule 23(a) provides:

One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

The United States Supreme Court has summarized the four basic requirements as: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997). The determination under Rule 23(a) is not perfunctory, "the court must conduct a 'rigorous analysis' to ensure that the prerequisites of Rule 23 are satisfied." *Elizabeth M. v. Montenez*, 458 F.3d 779, 784 (8th Cir. 2006) (quoting *Gen. Tel. Co. of the S.W. v. Falcon*, 457 U.S. 147, 161 (1982)). "Frequently that rigorous analysis will entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) (internal citations omitted).

"Plaintiffs must meet all requirements of Rule 23(a) and fall within one of the categories of Rule 23(b) to certify their . . . claims as a class action." *Blades v. Monsanto Co.*, 400 F.3d 562, 568-69 (8th Cir. 2005) (citing *Amchem*, 521 U.S. at 614). Rule 23(b) allows a class action if (1) there is otherwise a risk of (a) inconsistent adjudications or (b) impairment of interests for non-class members; (2) the defendant's conduct applies generally to the whole class; or (3) questions of law or fact common to members of the class predominate and the class action is a superior method for adjudication. *See* Fed. R. Civ. P. 23(b).

In addition to the Rule 23(a) and (b) requirements, pursuant to Rule 23(c)(1)(B): "An order that certifies a class action must define the class and the class claims, issues, or defenses, and must appoint class counsel under Rule 23(g)." Fed. R. Civ. P. 23(c). The plaintiffs propose a class action on behalf of four classes pursuant to Fed. R. Civ. P. 23.

## A. **Waiver**

Defendant contends that each contract has a waiver provision wherein each individual merchant has agreed to waive its rights to file a class action. The Terms and Conditions in the merchant agreements, stated:

> Waiver of Jury Trial and Covenant Not to Participate in a Class Action. . .. MERCHANT ALSO COVENANTS NOT TO BRING OR PARTICIPATE IN ANY CLASS ACTION AGAINST BANK BASED UPON ANY CLAIMS ARISING FROM THIS AGREEMENT. IF A CLASS PROCEEDING IS INITIATED AGAINST BANK, MERCHANT MAY NOT JOIN THAT PROCEEDING OR PARTICIPATE AS A MEMBER OF THAT CLASS.

Filing No. 106-1, Ex. 15, at Page ID #2384. The Supreme Court has indicated that mandatory arbitration provisions are enforceable and stop parties from asserting class claims.

Two Circuits have already affirmed the certification of classes in fraudulent overbilling cases. I*n re U.S. Foodservice*, 729 F. 3d 108 (2d Cir. 2013); *Klay v. Humana, Inc.*, 382 F.3d 1241, 1255 (11th Cir. 2004), abrogated in part on other grounds by *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008). The Courts have likewise done the same in the Racketeering Influenced and Corrupt Organizations Act (RICO) cases. *See, e.g., Huyer v. Wells Fargo & Co.*, 295 F.R.D. 332, 348 (S.D. Iowa 2013); *Murphy v. Gospel for Asia, Inc.*, 327 F.R.D. 227, 240 (W.D. Ark. 2018).

Next, plaintiffs also argue that the contract waiver language only precludes class actions brought against First National Bank. The parties are governed by the Merchant Application. The parties include the merchant, the bank and CPAY. The language in the agreement and application states: "MERCHANT ALSO COVENANTS NOT TO BRING OR PARTICIPATE IN ANY CLASS ACTION AGAINST BANK BASED UPON ANY CLAIMS ARISING FROM THIS AGREEMENT." Filing No. 106-1, Ex. 15, at Page ID #2384 § 13.3 (emphasis added). Each party has a separate signature box, indicating separate entities. Defendant contends that the language in the Merchant agreement states that: "To the extent that BANK has assigned and/or delegated rights and/or obligations to TMS under any particular provision of this AGREEMENT, references to BANK in such provisions shall include TMS." Filing No. 106-1, Ex. 15, p. 2, Page ID 2378, Recitals § F (emphasis added).

This argues defendant, means the term BANK also includes CPAY. Plaintiffs claim this language at most means that in some cases TMS and BANK will mean the same, but it does not support a construction that the term BANK always includes CPAY. There is no ambiguity, argues plaintiffs.

The Court agrees with the plaintiff. The class waiver by its language applies to the BANK and not to claims by the merchants against CPAY. If this is in any way deemed ambiguous, which the Court does not believe, the law is clear that any ambiguity goes to the drafter, which is certainly not the merchants. "Where there is a question as to a contract's meaning, [courts] apply the general rule that the contract will be construed against its drafter—here, the corporation." *Home Fed. Sav. & Loan v. McDermott & Miller,*

497 N.W.2d 678, 681 (Neb. 1993).  The Court finds that CPAY is not authorized under the contract  to utilize the class waiver provision, particularly against the merchants.

### B. Rule 23(a) Requirements

#### 1. Numerosity

The first prerequisite the plaintiffs must meet under Rule 23(a) is numerosity. *Amchem*, 521 U.S. at 613.  Rule 23(a)(1) requires "the class [be] so numerous that joinder of all members is impracticable."  *See* Fed. R. Civ. P. 23(a)(1).  Rule 23(a) requires only the impracticality, not the impossibility, of joinder.  *U.S. Fid. & Guar. Co. v. Lord*, 585 F.2d 860, 870 (8th Cir. 1978).  The plaintiffs need only show "that joining all members of the class would be difficult."  *Caroline C. By & Through Carter v. Johnson*, 174 F.R.D. 452, 462 (D. Neb. 1996) (citations omitted).  "There is no magic number for proving numerosity, but courts have stated as few as forty class members is sufficient to show joinder is impracticable."  *Harris v. D. Scott Carruthers & Assoc.*, 270 F.R.D. 446, 450 (D. Neb. 2010) (citing *Hale v. AFNI, Inc.*, 264 F.R.D. 402, 404 (N.D. Ill. 2009)).  "The Eighth Circuit has not established strict requirements regarding the size of a proposed class."  *Estate of Mahoney v. R.J. Reynolds Tobacco Co.*, 204 F.R.D. 150, 153 (S.D. Iowa 2001).

"Although mere allegations of numerosity are insufficient to meet this prerequisite, a plaintiff need not show the precise number of members in the class . . . ."  *Cortez v. Nebraska Beef, Inc.*, 266 F.R.D. 275, 289 (D. Neb. 2010) (quoting *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 930 (11th Cir. 1983)).  "[W]here the numerosity question is a close one, a balance should be struck in favor of a finding of numerosity, since the court has the option to decertify pursuant to Rule 23(c)(1)."  *Id.*  Typically, the court may rely on the pleadings, however "it may be necessary for the court to probe behind the pleadings

to ensure that the prerequisites of Rule 23 have been met." *Chesher v. Neyer*, 215 F.R.D. 544, 546 (S.D. Ohio 2003) (citing *Gen. Tel. Co. of S.W.*, 457 U.S. at 160).

In the instant case, the plaintiffs have presented evidence of potentially 160,000 class members who have been allegedly "swindled" for over $100 million dollars. Defendant disputes this exact number but does not dispute that plaintiffs have met the numerosity requirement. Plaintiff's expert, Arthur Olsen, reviewed the potential class members and determined that the 161,519 CPAY customers were subjected to at least one discount-rate increase from January of 2012 to October of 2018. Plaintiffs contend that number will increase as they look deeper into the documents.

After consideration of the number of persons in the proposed class, the nature of the action, the inconvenience of trying individual suits, and other factors relevant to the practicality of joining all the putative class members, the court finds the plaintiffs satisfy the numerosity requirement.

### 2. Commonality

Second, the plaintiffs must prove the element of commonality. *Amchem*, 521 U.S. at 613. Rule 23(a)(2) requires there be "questions of law or fact common to the class." *See* Fed. R. Civ. P. 23(a)(2). "Rule 23 is satisfied when the legal question 'linking the class members is substantially related to the resolution of the litigation.'" *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995) (quoting *Paxton v. Union Nat. Bank*, 688 F.2d 552, 561 (8th Cir. 1982)). However, "[t]he rule does not require that every question of law or fact be common to every member of the class." *Paxton*, 688 F.2d at 561. "[T]he commonality requirement imposes a very light burden on the Plaintiff seeking to certify a class and is easily satisfied." *In re Hartford Sales Practices Litig.*, 192 F.R.D.

592, 603 (D. Minn. 1999). Nevertheless, Rule 23(a)(2) "language is easy to misread, since '[a]ny competently crafted class complaint literally raises common "questions"'". *Wal-Mart Stores*, 564 U.S. at 349 (quoting Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 132 (2009)). The Court stated in Wal-Mart Stores:

> What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a class wide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

*Id.* at 350 (citing *Nagareda*, supra, at 132).

Plaintiffs point out, though, that it may not be necessary to analyze this issue, as Courts have held that the commonality requirement under Rule 23(b)(3) is subsumed by the predominance inquiry. *Amchem Prods., Inc.*, 521 U.S. at 609 (stating that "Rule 23(a)(2)'s 'commonality' requirement is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions"); *Browne v. P.A.M. Transp., Inc.*, No. 5:16-CV-5366, 2019 WL 333569, at *2 (W.D. Ark. Jan. 25, 2019) (same); *Hanson v. Acceleration Life Ins. Co.*, No. CIV A3-97-152, 1999 WL 33283345, at *9 (D.N.D. Mar. 16, 1999) (same); *see also In re Target Corp. Customer Data Sec. Breach Litig.*, 309 F.R.D. 482, 486 (D. Minn. 2015) (describing commonality and predominance as "related and somewhat interdependent concepts").

Defendant disagrees and argues that the commonality and typicality criteria are not met, because there must be a determination of whether the class members are "qualified" for the position or can be reasonably accommodated before one can determine

class composition.  This will vary, argues defendant, based on the individual merchant and the individual job.

In this case, the Court finds that the standard can be easily met.  The predominance arguments apply here.  Further, the allegations show that CPAY systematically raised discount and contractual rates and participated in shifting transactions to different tiers and creating unfounded fees.  The plaintiffs have met their burden in this regard.  "A sufficient nexus is established if the claims or defenses of the class and the class representatives arise from the same event or pattern or practice and are based on the same legal theory."  *Kornburg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984).

### *3. Typicality*

Third, the class representatives have the burden to show typicality of their claims in relation to the other putative members of the class.  *Amchem*, 521 U.S. at 613.  Rule 23(a) requires a named plaintiff to have claims or defenses which "are typical of the claims or defenses of the class."  *See* Fed. R. Civ. P. 23(a)(3).  The Eighth Circuit, "long ago defined typicality as requiring a demonstration that there are other members of the class who have the same or similar grievances as the plaintiff."  *Chaffin v. Rheem Mfg. Co.*, 904 F.2d 1269, 1275 (8th Cir. 1990) (internal quotations and citations omitted).  "Factual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims and gives rise to the same legal or remedial theory."  *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996).  The burden to establish typicality is "fairly easily met so long as other class members have claims similar to the named plaintiff."  *DeBoer v. Melon Mtge. Co.*, 64 F.3d

1171,1174 (8th Cir. 1995).  However, "[t]he presence of a common legal theory does not establish typicality when proof of a violation requires individualized inquiry."  *Elizabeth M. v. Montenez*, 458 F.3d 779, 787 (8th Cir. 2006).

The Court finds the claims and defenses are typical of the class.  Plaintiffs are alleging the same legal theories, as those that will be brought by the class, including fraudulent concealment; breach of contract and duty of good faith and fair dealing and the RICO violation.  The claims are clearly typical of the class pursuant to Fed. R. Civ. P. 23(a)(3).

### *4. Adequacy of Representation*

The fourth prerequisite a plaintiff must meet under Rule 23(a) for class certification is adequacy of representation.  *Amchem*, 521 U.S. at 613.  Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class."  *See* Fed. R. Civ. P. 23(a)(4).  "The focus of Rule 23(a)(4) is whether: (1) the class representatives have common interests with the members of the class, and (2) whether the class representatives will vigorously prosecute the interests of the class through qualified counsel."  *Paxton v. Union National Bank*, 688 F.2d 552, 562-63 (8th Cir. 1982) (citing *Gonzales v. Cassidy*, 474 F.2d 67, 72 (6th Cir. 1973)).

The plaintiffs have shown they share a common interest with the putative class members and that, as the class representatives, they will vigorously prosecute the interests of the class through qualified counsel.  There is no indication, as the defendants argue, the plaintiffs' interests are divergent or opposed.  The plaintiffs demonstrated a strong understanding of their case, their responsibilities to the class, and the expectations as class representatives.  The plaintiffs have already produced documents, responded to

discovery requests, and been deposed. The Court believes that counsel will also fairly and adequately represent the class members, and they are experienced and competent to lead this case. Wagstaff & Cartmell LLP is a Kansas City based law firm with more than 30 attorneys and more than 100 employees. The firm has a national practice handling complex litigation, including major multi-district litigation and class actions. Furthermore, prior to his confirmation the trial judge litigated cases against the firm and found it to be experienced and competent.

### C. Rule 23(b)(3) Requirements

For class certification, the plaintiffs must also prove this action may be maintained under Rule 23(b)(1), (2), or (3). Under Rule 23(b)(3), the court must find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *See* Fed. R. Civ. P. 23(b)(3). "The requirements of 'predominance' and 'superiority' are stated in Rule 23(b)(3) in the conjunctive; both must be present for an action to be maintained under that provision." *Bryant v. Bonded Accounts Serv./Check Recovery*, 208 F.R.D. 251, 261 (D. Minn. 2000).

#### 1. Predominance

As to the first prong of the inquiry, the Supreme Court has ruled the "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623 (citing 7A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 1777, p. 518-19 (2d ed. 1986)). "In order to 'predominate,' common issues must constitute a significant part of

the individual cases." *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir. 1986).

"Where there is an essential factual link between all class members and the defendants, for which the law provides a remedy, questions of law or fact common to the class exist." *D'Alauro v. GC Servs. Ltd. P'Ship*, 168 F.R.D. 451, 458 (E.D.N.Y. 1996) (citation omitted). "[W]hen one or more of the central issues in the action are common to the class and can be said to predominate, the action will be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately." *Harris v. D. Scott Carruthers & Assoc.*, 270 F.R.D. 446, 453 (D. Neb. 2010) (quoting *Jenkins*, 782 F.2d at 472) (alteration in original).

Defendant disagrees relying on the *Ebert* and *Amchem* analysis. "The requirement of predominance under Rule 23(b)(3) is not satisfied if individual questions … overwhelm the questions common to the class." *Ebert v. General Mills, Inc.*, 823 F.3d 472, 478-79 (8th Cir. 2016). "In contrast to Rule 23(a)(2), the issue of predominance under Rule 23(b)(3) is qualitative rather than quantitative." *Id.* Indeed, "the predominance criterion is far more demanding" than commonality. *Amchem*, 521 U.S. at 624. "The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation … and goes to the efficiency of a class action as an alternative to individual suits." *Ebert*, 823 F.3d at 479 (internal citations and quotations omitted).

Defendant contends that individual questions overwhelm any common ones. "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prime facie showing [or] the

issue is susceptible to generalized, class-wide proof.'" *Tyson Foods v. Bouaphakeo*, 577 U.S. __, 136 S.Ct. 1036, 1045 (2016) (quoting 2 W. Rubenstein, Newberg on Class Actions § 4:50, pp. 196-97 (5th ed. 2012)). "If to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question." *Avritt v. Reliastar Life Insr. Co.*, 615 F.3d 1032, 1035 (8th Cir. 2010) (quoting *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005)).

Defendant argues that plaintiffs' individual claims and factual issues overwhelm the individual issues. Thus, argues defendant, this is not a superior method of adjudication. Further, defendant contends that a mere finding of liability cannot be used to determine punitive damages in the first stage. That determination argues defendant must be made at the individual stages of the litigation. *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 434 (5th Cir. 1998); *Equal Employment Opportunity Comm'n v. JBS USA, LLC*, No. 8:10CV318, 2011 WL 13137568, at *2–3 (D. Neb. May 31, 2011) (quoting Allison and similarly concluding "that punitive damages should be part of the Phase II litigation").

The Court finds that "questions of law or fact in this case are common to the class members and predominate over any questions affecting only members." Fed. R. Civ. P. 23(b)(3). The proposed classes are sufficiently cohesive as to the alleged pattern of the class, more so than to the individuals. The class is easily ascertainable with or without the expert work of Mr. Olsen, and the class will become more obvious once defendant provides all the necessary data. *See, e.g., McKeage v. TMBC, LLC*, 847 F.3d 992, 999 (8th Cir. 2017) (affirming certification though it required "an intensive file-by-file review

process" to determine class members). The plaintiffs, as a whole, do in fact allege and have injury. The same evidence will be used to establish class-wide proof. Further, the common issues predominate over the individual issues. The important evidence will be ascertainable from CPAY's files, testimony and expert reports. The legal theories all turn on the same evidence. Assuming the general allegations are true, the plaintiffs in this case have made a prima facie case based on the common evidence. *In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 618 (8th Cir. 2011) (quoting *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005)). The only possible variations that the Court sees at this time is the computation of any damages. However, "[W]here damages can be computed according to some formula, statistical analysis, or other easy or essentially mechanical methods, the fact that damages must be calculated on an individual basis is no impediment to class certification." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1259-60 (11th Cir. 2004) (footnotes omitted). Here, it appears that Mr. Olsen can make such calculations based on CPAY's billing records and such would be ministerial in nature. For these reasons, the Court finds predominance requirement is clearly met.

### *2. Superiority*

For the second prong of the Rule 23(b)(3) inquiry, the class action must be "superior to other available methods for the fair and efficient adjudication of the controversy." *See* Fed. R. Civ. P. 23(b)(3). "Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy." *Estate of Mahoney v. R.J. Reynolds Tobacco Co.*, 204 F.R.D. 150, 161 S.D. Iowa 2001) (quoting *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996)). "Having to engage in separate threshold inquiries for each class member

prior to reaching the common issues does not promote such economy. . . . [It] will create judicial dis economy." *Estate of Mahoney*, 204 F.R.D. at 161 (quoting *Smith v. Brown & Williamson Tobacco Corp.*, 174 F.R.D. 90, 94 (W.D. Mo. 1997)) (emphasis in original).

The central issues are common to the class and can fairly be said to predominate over individual issues. Class-action treatment is not prohibited just because there may be some matters that will have to be tried separately. The plaintiffs challenge a single cohesive policy and could arguably provide relief to each member of the class. Also, the court has tools at its disposal for management of class actions and it may turn out that a class action is the "superior" method of adjudicating the controversy. The case is potentially a candidate for hybrid class action treatment under Rule 23(c)(4).

As Judge Posner once stated, "[t]he realistic alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30." *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004). The same principle applies in this case. The amount of damages allegedly is over $100,000 million dollars. The damages for these two plaintiffs are approximately $200.00. A class action seems to be the superior method of challenging the actions of the defendant. There is no other way for the plaintiffs to address CPAY's alleged behaviors.

3. *Filing No. 129, Motion to file a Surreply brief or strike evidence*

Defendant argues that Thomas Payne, owner of plaintiff Skip Merchant, has changed his testimony regarding the PCI Non-Compliance Fee. This declaration, argues defendant, conflicts with prior sworn testimony, first arguing that Payne challenged the fee and later saying he sued because it is pure profit for CPAY. Similar changes have been disregarded under the sham affidavit rule. *See, e.g., Camfield Tires, Inc. v. Michelin*

*Tire Corp.*, 719 F.2d 1361, 1365-66 (8th Cir. 1983) (noting that "[a] party should not be allowed to create issues of credibility by contradicting his own earlier testimony"). Defendant contends five additional exhibits were submitted and plaintiffs have abandoned the theory of fraud in the inducement in favor of fraud in the performance of their contracts.

Plaintiffs contend that these are not new responses and striking the evidence will not change the outcome in any event. The Court agrees. Plaintiff's responded to the arguments of CPAY. Any new arguments appear to have occurred during and after the filing of the Amended Complaint and not in this reply brief. After reviewing the reply brief, the Court does not believe the plaintiffs' changed their theories of the case. Likewise, the Court does not believe that the testimony by Mr. Payne constituted a "sham affidavit" as it does not, for purposes of this motion, essentially change the theory of the case. The Court finds this motion is not supported by the claims and will deny the same. *See, e.g., Liberty Legal Found. v. Nat'l Democratic Party of the USA, Inc.*, 875 F. Supp. 2d 791, 797 (W.D. Tenn. 2012) (sur-replies are "highly disfavored, as they usually are a strategic effort by the nonmoving party to have the last word on a matter").

4.  *Filing No. 99, Motion to strike the report and testimony of Karl J. Borden*

Defendant moves to strike this report and testimony pursuant to Fed. R. Evid. 702. Federal Rule of Evidence Rule 702 allows for the admission of expert opinions. Under Rule 702,

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993) (holding that when faced with a proffer of expert testimony, trial judges are charged with the "gatekeeping" responsibility of ensuring that all expert evidence admitted is both relevant and reliable). *Daubert* applies to all expert testimony, not only scientific expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

In light of *Daubert* and *Kumho Tire*, this Court must screen proffered expert testimony for relevance and reliability. *See Bland v. Verizon Wireless, (VAW) L.L.C.*, 538 F.3d 893, 896 (8th Cir. 2008). A reliable opinion must be based on scientific methodology rather than on subjective belief or unsupported speculation. *See Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1208 (8th Cir. 2000). In assessing reliability, the Court should consider factors including whether the proposed expert's theory, methodology or technique: 1) can be and has been tested; 2) has been subjected to peer review; 3) has a known or potential rate of error; and 4) is generally accepted by the relevant community. *Bland*, 538 F.3d at 896. This list of factors is not exclusive, and this Court is allowed "great flexibility" in its analysis. *Jaurequi v. Carter Mfg. Co.*,173 F.3d 1076, 1082 (8th Cir. 1999). Doubts regarding expert testimony should generally be resolved in favor of admissibility. *United States v. Finch*, 630 F.3d 1057, 1062 (8th Cir. 2011). The expert's information or opinion must also assist the trier of fact in understanding or determining a fact in issue. Fed. R. Evid. 702(a). "This condition goes primarily to relevance." *Daubert,* 509 U.S. at 591.

Defendant contends that Mr. Borden fails to qualify as a proper expert under Rule 702. It argues that Borden, who is not an attorney, intends to give a legal opinion regarding class certification. *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187-88 (3d Cir. 2015) ("We join certain of our sister courts to hold that a plaintiff cannot rely on challenged expert testimony, when critical to class certification, to demonstrate conformity with Rule 23 unless the plaintiff also demonstrates, and the trial court finds, that the expert testimony satisfies the standard set out in Daubert"). The legal opinions include: first, CPAY is liable and plaintiffs are typical of the class of merchants injured by CPAY's fees; second, his opinions were formed by reading internal CPAY emails and basing his opinions on intent; and third, his opinions opine on the state of mind of CPAY's former principals or non-parties.[2]

Borden received a Doctor of Education degree from the University of Massachusetts in 1975. Filing No. 91-2, Borden Report, App'x A at 1 Page ID #1211. He completed coursework in financial economics at the University of Cincinnati but did not earn a degree in financial economics. Filing No. 104-1, Ex. 13, Borden Dep. at 38:19-39:4. None of the coursework Borden completed, argues CPAY, was regarding payment processing systems. *Id.* at 39:8-10. He currently serves as a professor at the University of Nebraska at Kearney. Filing No. 91-2, Borden Report ¶ 10. He teaches courses on treasury management systems and working capital management, which includes value

---

[2] Plaintiffs asked the following questions of their expert: (1) Did CPAY impose charges or collect fees from Plaintiffs and others in the proposed Class that were deceptive, wrongful, or contrary to contract terms or industry standards? (2) Can evidence that is common to all merchants adversely impacted – as opposed to evidence unique to individual merchants – be used to sufficiently identify the imposition of the wrongful charges and fees in question, to prove the wrongfulness of the charges and fees in question, to identify which merchants were imposed such charges and fees, and to prove in what amounts such charges or fees were paid by each affected merchant? (3) Are the named Plaintiffs – Skip and Sandy's – typicaland representative of the broader group of merchants similarly impacted by CPAY's actions? Borden Report ¶ 17.

transfer systems. He worked for NXGEN which is a merchant acquirer like CPAY and whose owner was Borden's colleague. He previously testified in a case concerning damages calculations, one in a wrongful death case and one in a personal injury case.

Borden testified that to reach his conclusions, he (1) analyzed over 300 million merchant charge records for over 60,000 merchants; (2) worked with a professional systems engineer to put CPAY's fee data and transaction history records into a searchable database; (3) reviewed the standard form Merchant Processing Application & Agreement; (5) reviewed CPAY's data records which resulted in the billing statements; (6) reviewed CPAY's statements to merchants as compared to internal records; (7) reviewed the deposition testimony of one CPAY representative; (8) reviewed internal emails by the executives of CPAY; (9) calculated the yield; and (10) applied his education, experience, knowledge and training. Filing No. 91-2, Borden Report ¶ 18. Defendant contends, however, that Borden relied on his son, Jason Borden, to pull data together.

CPAY contends that Borden is not qualified to render his opinions under *Daubert*. *See In re Wholesale Grocery Prods. Antitrust Litig.*, No. 09-MD-2090 ADM/AJB, 2012 WL 3031085 *6 (D. Minn. July 25, 2012), aff'd, 752 F.3d 728 (8th Cir. 2014) ("The Daubert inquiry at the class certification stage is to guard against certification of a class based on an expert opinion so flawed that it is inadmissible as a matter of law"). Second, CPAY argues the opinions are inadmissible legal opinions in any event, arguing that all three of the questions posed to Borden by the plaintiff call for legal conclusions. *In re Acceptance Ins. Companies Sec. Litig.*, 423 F.3d 899, 905 (8th Cir. 2005) ("When the expert opinions are little more than legal conclusions, a district court should not be held to have abused its discretion by excluding such statements"). CPAY contends that the first question and

answer go to the ultimate liability issue; and the other two answers parrot elements of Rule 23 class certification analysis and just says those requirements have been satisfied. Third, with regard to Borden's methodology, CPAY contends it is unreliable.

Plaintiffs argue that a comprehensive Daubert analysis is not required. *In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011). Further, plaintiffs contend that that Dr. Borden is a qualified expert in the credit card processing industry; his opinions are relevant; and his opinions are reliable. Also, plaintiffs argue that "Dr. Borden has significant knowledge, education, training, and experience in payment processing systems as a professor of finance for the last 33 years and his own personal involvement as both a merchant who accepts credit card payments and as a merchant acquirer, like Defendant CPAY, who manages his own customer book." Filing No. 113 at 1. In addition, CPAY has not designated an expert to dispute the opinions of Dr. Borden.[3]

First, the Court points out that it need not rely on Dr. Borden's opinions to support the decision regarding class certification. As noted above there is ample evidence in the record to support plaintiffs' request for class certification. It is clear from the record as well as the testimony presented thus far in the case. However, with that said, Dr. Borden has been a Professor of Financial Economics at the University of Nebraska at Kearney for over 30 years. He is on the Graduate Faculty of the University of Nebraska system and is recognized by the American Association of Collegiate Schools of Business (AACSB) as "academically" and "professionally" qualified. He specializes in corporate finance and has authored several publications. He has been a merchant acquirer for over

---

[3] "CPAY's expert Ratner conceded in his deposition that he was not retained as a liability expert and offers no opinions about whether or not plaintiffs can use common evidence to establish liability in this case. Ratner Dep. Tr., Pltfs' Ex. 49, 160:1-20; 181:1-4." Filing No. 113 at 2.

fifteen years. For this reason, the Court finds his general testimony meets the criteria necessary for this motion.

Further, the Court agrees that there is no need for a Daubert motion at this juncture in this litigation. "The main purpose of Daubert exclusion is to protect juries from being swayed by dubious scientific testimony." *In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d at 613; *see also, Klein*, 2018 WL 1187411 at *3; *Bassett v. Credit Mgmt. Servs., Inc.*, No. 8:17CV69, 2018 WL 3159791, at *7 (D. Neb. June 28, 2018). "That interest is not implicated at the class certification stage where the judge is the decision maker." *Id.* The Court is able to review the evidence and rule without that testimony. With that said, the Court will not consider any opinions regarding Bordon's purported legal conclusions in reviewing his testimony. *In re Acceptance Ins. Cos. Sec. Litig.*, 423 F.3d 899, 905 (8th Cir. 2005). With regard to the reliability of Borden's analytical methodology, his use of primarily documents, rather than personal conversations or reliance on deposition testimony, goes to the weight of this evidence. Again, Borden can rely on the facts he has compiled from the documents, but he cannot give an expert opinion espousing conclusions invading the province of the jurors. This includes statements about whether the defendant's conduct was right or wrong. "Personal views on corporate ethics and morality are not expert opinions." *In re Baycol Prod. Litig.*, 532 F. Supp. 2d 1029, 1053-54 (D. Minn. 2007) ("Plaintiffs agree that an expert witness' personal ethical leanings are inappropriate. Plaintiffs thus agree that [their expert] should be precluded from . . . using the word 'ethics' and its cognates"). Likewise, Borden may not offer any opinions on the defendant's state of mind. *Kruszka v. Novartis Pharm. Corp.*, 28 F. Supp. 3d 920, 931 (D. Minn. 2014).

Accordingly, the Court will deny the motion to strike this evidence at this point in the case.

5. *Filing No. 117, motion for summary judgment*

Defendant asks the Court to grant summary judgment on all counts of the First Amended Class Action complaint pursuant to Fed. R. Civ. P. 56. CPAY argues that all of its merchant agreements are individualized. First, defendant argues that notwithstanding that the merchant charges were consistent with the terms of the contract, the claims for breach of contract are time barred, because there is a 90-day notice provision that plaintiffs failed to provide to defendant.

Second, defendant argues that they are entitled to summary judgment on plaintiffs' RICO claims. There is, argues defendant, no predicate act of wire fraud or mail fraud, which are the two predicate acts for plaintiffs' claims.

Third, defendant contends there is no evidence to support the claim of fraudulent concealment. The fees, says defendant, were conspicuously disclosed on the face of the Merchant Applications, or were the subject of proper notice per the terms of the agreements.

a. *Breach of Contract claim*

A breach of contract claim under Nebraska law requires (1) the existence of a promise, (2) its breach, (3) damage, and (4) compliance with any conditions precedent that activate the defendant's contractual duty. *Phipps v. Skyview Farms, Inc.*, 610 N.W.2d 723, 730 (Neb. 2000). "[T]he meaning of a contract and whether a contract is ambiguous are questions of law." *Frohberg Elec. Co. v. Grossenburg Implement, Inc.*, 900 N.W.2d 32, 37 (Neb. 2017); *Windstream Corp. v. Da Gragnano*, 757 F.3d 798, 803 (8th Cir. 2014)

("Construction of an unambiguous contract is 'a question of law appropriate for summary judgment'").  "A contract written in clear and unambiguous language is not subject to interpretation or construction and must be enforced according to its terms."  *Frohberg,* 900 N.W.2d at 38.

CPAY argues that plaintiff entered into a binding Merchant Agreement.  However, defendant contends that plaintiffs failed to notify CPAY of these claims, which it argues is a condition precedent to brining the claims.  *See Intervision Sys. Techs., Inc. v. Intercall, Inc.,* 872 N.W.2d 794, 800 (Neb. Ct. App. 2015) ("[T]he majority of courts in other jurisdictions addressing contract provisions that require notice of a dispute . . . have found them to be enforceable").  The Court also determined that the parties agreed to be bound by the terms of the contract, so the provision was not unconscionable, and the court could not "rewrite the contract to exclude it."  *Id.* at 800.  *See, e.g., Zam & Zam Super Market LLC,* 736 F. App'x at 278, * 278 (2nd Cir. 2018) ("[W]e conclude as a matter of law that it is not grossly unreasonable to expect a merchant to review its bill and provide written notice of any disputed charges within sixty days"); *Cobra Tactical, Inc.,* 315 F. Supp. 3d 1342, 1350–51 (N.D. Georgia 2018) (concluding 60-day notice provision in merchant agreement was not "exculpatory," "substantively unconscionable," or "procedurally unconscionable" under Georgia law).  This is true, argues defendants, in the case before this Court.  Plaintiffs did not give notice of the fee disputes in accordance with the Merchant Agreement, and thus, contends defendant, this suit must fail.  Further, defendant contends that the Term and Conditions state that FNBO has delegated its responsibility under the agreement to TMS and CPAY.  Thus, defendant contends that any references to the BANK include CPAY.

Plaintiffs contend that the Notice Provision[4] does not bar plaintiffs' breach of contract as a matter of law. First, argues plaintiffs, the notice provision only applies to "SALES or SERVICES activity.[5] It does not mention FEES which is separately defined. PL SOF ¶¶ 33-38. *Davenport Ltd. Partnership v. 75th & Dodge I, L.P.*, 780 N.W.2d 416, 427 (Neb. 2010) ("A court is not free to rewrite a contract or to speculate as to terms of the contract which the parties have not seen fit to include. And a contract is viewed as a whole in order to construe it. Whatever the construction of a particular clause of a contract, standing alone, may be, it must be read in connection with other clauses, and all writings forming part of the same transaction are interpreted together") (citations omitted). Second, it requires plaintiffs to provide written notice of any discrepancies to the BANK, not to CPAY. Third, even if the notice provision required timely written notice, plaintiffs contend that CPAY failed to provide them with information regarding the "fee manipulations," information that they contend was concealed by CPAY. Further, plaintiffs argue that CPAY urged customers to "call" with discrepancies, which apparently did not constitute notice. Finally, this was a continuing scheme to defraud the merchants, but assessing upcharges by use of a secretive overbilling scheme to increase profits, while cheating the merchants, argues plaintiffs, thus making the agreement unconscionable.

---

[4] The Notice Provision states: Section 7.5 states:

> MERCHANT is supplied with monthly reports by BANK regarding MERCHANT's SALES or SERVICES activity. It is MERCHANT's sole responsibility to report any error or discrepancies detected by MERCHANT in writing to BANK within ninety (90) days following the end of the monthly reporting period. After such period, MERCHANT will be deemed to have accepted the monthly reports as delivered.

Terms, § 7.5 (emphasis added); Filing No. 134, Pl SOF ¶ 33 at Page id #3247.

[5] "SALES" are the sales transactions resulting from the merchant's acceptance of financial service cards. *Id.*, Pl. SOF ¶ 37 at Page ID #3248. "SERVICES" are the "transaction processing and other services and products in relation to financial service cards" provided by BANK to the merchant. *Id.*, at #3247, Pl. SOF ¶ 36. "FEES" are "the fees as set forth in the Merchant Application and all other sums owed to BANK for SALES and SERVICES as set forth in the Agreement as amended from time to time." *Id.* at 3248, Pl. SOF ¶ 38.

Plaintiffs also argue that the language referring to "errors or discrepancies" in the notice provision cover only mistaken charges and not those that are willful efforts by CPAY to change the fees.  Next, plaintiffs contend that the exculpatory clause is unconscionable and unenforceable under Nebraska law.  Plaintiffs also argue that the provision only gives the bank[6] and not CPAY the right to change fees.[7]  Plaintiffs further submit that CPAY had no right under the contract to charge or add merchant fees.  Only the BANK, says plaintiff, had the right to charge or change or add additional fees[8], and even the BANK's rights regarding fees were limited to specific circumstances.[9]  Further,

---

[6] Plaintiff argues that this is a good example of CPAY attempting to articulate a good faith basis for increases, suggesting a Bank increase, which was in fact just a CPAY revenue enhancement, causing plaintiffs to have no basis at the time to dispute the additional fees:

> In response to upcoming modifications made by industry card brands to interchange rates, merchants boarded prior to January 1st, 2016 will see an eight-basis point increase to their gross processing volume beginning April 1st, 2016.

Filing No. 134, SOF at ¶ 102 at Page ID # 3259.

And again, on the February 2016 Statement, Plaintiff Sandy was given the following notice:

> In order to help consolidate modifications from card brands affecting interchange rates (Visa Base II Trans Fees, International Acquirer Fee, API and LPA Fees, Mastercard KB Trans Fees, International Service Assessment Fees, Acquirer License Fee and more), there will be a seven basis points 'TSSNF Fee' on all gross card brand processing volume effective April 1st.

*Id.* Pl. SOF ¶ 128 at Page ID # 3264.

[7] Major credit cards allow only the BANK to establish and change fees.  See Mastercard Rules, Filing No. 135-1, Exhibit 1;  Mastercard Rules, Ex. 1, 7.6.1 and 1.a,; VISA Visa Global Acquirer Risk Standards, §4.10, Filing No. 135-Exhibit 2; Visa Global Acquirer Risk Standards, §4.4 Merchant Agreement Review, Exhibit 2; Visa Global Acquirer Risk Standards, §8.3 Acquirer Responsibilities When Using Agents, Exhibit 2.

[8] Section 3.5 of Skip and Sandy's Merchant Agreement (and all other class members' Merchant Agreement) states:

The FEES may be amended by BANK on thirty (30) days written notice to MERCHANT unless provided otherwise herein. (Terms and Conditions, Filing No. 106-1, p. 5, § 3.5).

[9] Section 13.20 of Skip and Sandy's Merchant Agreement (and all other class members' Merchant Agreement) states:

> The CARD BRANDS require that the following be disclosed to MERCHANT:
> (i) if applicable, BANK is in control of Independent Sales Organization's ("ISO") and/or Member Service Provider's ("MSP") performance under this AGREEMENT;
> (ii) BANK must pre-approve all FEES;
> (iii) the AGREEMENT may not be amended without BANK's express written consent;
> (iv) if applicable, ISO and/or MSP may not have access to MERCHANT's funds; and
> (v) BANK may not waive the foregoing requirements.

Terms and Conditions, Filing No. 106-1, p. 10, §13.20.  Section 5.6 of FNBO and CPAY's Third Party Organization Marketing and Registration Agreement ("the CPAY/FNBO Agreement") states:

plaintiffs note that the Merchant Agreement does not require written challenges to fee disputes, and in any event, CPAY is not listed in the notice provision as a party that would be noticed. Plaintiffs contend that CPAY has offered no evidence to rebut the overwhelming evidence of deception. None of the other contract provisions in the plaintiffs' Merchant Agreement provide CPAY with the ability to amend or change the stipulated fees. *See*, Sandy's Merchant Agreement, Filing No. 105-1. These are all, argue plaintiffs, issues of material fact to be decided at trial.

Plaintiffs also argue that "where a promisor prevents, hinders, or renders impossible the occurrence of a condition precedent to his or her promise to perform, the promisor is not relieved of the obligation to perform and may not invoke the other party's nonperformance as a defense when sued upon the contract." *D&S Realty, Inc. v. Markel Ins. Co.*, 816 N.W.2d 1, 13 (Neb. 2012) ("In short, under the doctrine of prevention, where a party to a contract is the cause of the failure of the performance of the obligation due him or her, that party cannot in any way take advantage of that failure").

The Court agrees that it should not expand the definition of FEES or SALES. *Davenport*, 780 N.W. 2d at 428 ("The expression of one thing implies the exclusion of another, and in this case, the use of the words 'expiration' and 'termination' together in

---

The ASSOCIATIONS require that FNBO must control the establishment of MERCHANT fees and has the right to review and approve pricing of MERCHANTS as required by ASSOCIATIONS to ensure compliance with the RULES. MERCHANT pricing and MERCHANT profitability are the sole responsibility of COMPANY and will not be monitored or guaranteed by FNBO. COMPANY shall report to FNBO all fees charged to MERCHANTS. COMPANY agrees to notify FNBO in a format reasonably acceptable to FNBO of changes by COMPANY to all MERCHANTS' charges and fees or other maintenance changes with at least thirty (30) days written notice prior to the effective date of the change. COMPANY may change charges and fees to MERCHANTS and is responsible for notifying MERCHANTS with thirty (30) days written notice of such change. All changes in fees and charges by COMPANY shall be effective on the first day of the month following the thirty (30) day notice to FNBO or after COMPANY makes the change on FNBO's system.

(CPAY/FNBO Agreement, Filing No. No. 101-4, p. 7, § 5.6).

several places, but not in exhibit D, provides ample support for the district court's conclusion that the expiration of the Ground Lease was not a 'termination' within the meaning of exhibit D").

Under Nebraska law, Plaintiffs must demonstrate both substantive and procedural unconscionability. *See Myers v. Neb. Inv. Council*, 724 N.W.2d 776, 799 (Neb. 2006). Substantive unconscionability does not exist "unless the terms are grossly unfair under the circumstances that existed when the parties entered into the contract." *Id.* Similarly, procedural unconscionability requires a "disparity in respective bargaining positions of parties to a contract." *Id.* "'Unconscionability is determined in light of all the surrounding circumstances, including (1) the manner in which the parties entered into the contract, (2) whether the parties had a reasonable opportunity to understand the terms of the contract, and (3) whether the important terms were hidden in a maze of fine print.'" *Henggeler v. Brumbaugh & Quandahl, P.C., LLO*, 894 F. Supp. 2d 1180, 1187 (D. Neb. 2012) (Bataillon, J.) (quoting *Parizek v. Roncalli Catholic High Sch.*, 655 N.W.2d 404, 408 (Neb. 2002)).

Based on the foregoing, the Court finds the plaintiffs have made a prima facie evidentiary showing of breach of contract. They have also shown that the contract may be unconscionable, due to the alleged fraud and misrepresentations. The plaintiffs have in fact offered argument and evidence of deception. These are fact issues. For the reasons set forth herein, the Court will deny the motion for summary judgment as it relates to the breach of contract claim.

*b.* *Breach of covenant of Good Faith and Fair Dealing*

Under Nebraska law, "[a] violation of the covenant of good faith and fair dealing occurs *only* when a party violates, nullifies, or significantly impairs any benefit of the contract." *In re Application of Ne. Pub. Power Dist.*, 912 N.W.2d 884, 896 (Neb. 2018); *Spanish Oaks, Inc. v. Hy-Vee, Inc.*, 655 N.W.2d 390, 400 (Neb. 2003). Defendants contend that this claim is the same as the breach of contract claim and thus should be entitled to summary judgment. *See Spanish Oaks, Inc.*, 655 N.W.2d at 400.

Defendant argues that this theory is redundant of the plaintiffs' breach of contract claim. Plaintiff disagrees contending that these are both separate causes of action. As this Court has stated, the plaintiff can plead alternative legal theories of recovery. *Corona v. First Nat'l Bank of Omaha*, 2014 WL 2558327 *4 (D. Neb. 2014). Plaintiffs have clearly articulated its alleged dishonest billing actions.

The Court agrees with the plaintiffs. For the same reasons as discussed in the previous section, breach of contract, the Court will likewise deny the motion for summary judgment. The plaintiff has every right to plead and prove alternative theories of recovery.

*c.* *RICO claims*

RICO is concerned with "eradicating organized, long-term, habitual criminal Activity." *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 353 (8th Cir. 2011). Generally, the purpose of RICO is not to convert regular civil suits into RICO cases. *Stonebridge Collection, Inc. v. Carmichael*, 791 F.3d 811, 822 (8th Cir. 2015). Section 1962(c), prohibits "any person employed by or associated with any enterprise engaged in . . . interstate . . . commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

To succeed on such a claim, plaintiffs must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *H & Q Props., Inc. v. Doll*, 793 F.3d 852, 856 (8th Cir. 2015); *Crest Constr. II, Inc.*, 660 F.3d at 353.

Defendant argues that plaintiff is unable to show racketeering activity and cannot show a scheme to defraud, as discussed under the contract section, because the terms were in the Merchant Agreement. Plaintiffs agreed to these terms, argues defendant.

Plaintiffs argue that the racketeering activity occurred because of numerous violations wire and mail fraud statutes. CPAY created a scheme to have the sellers to the merchants and thereafter increase the rates and fees without consultation with FNBO. No merchant, argues plaintiffs, agreed to pay these fees. This plan, contends plaintiffs, were intended to deceive the plaintiffs. They concealed, manipulated and controlled information. These charges were not pre-approved by FNBO. All of these material facts were not disclosed to the merchants. The Eighth Circuit held:

> The crime of mail fraud is broad in scope and its fraudulent aspect is measured by a non-technical standard, condemning conduct which fails to conform to standards of moral uprightness, fundamental honesty, and fair play. A plaintiff may, but need not, allege that a defendant made misrepresentations of fact. Because misrepresentations of fact are not necessary to the offense, it follows that no misrepresentations need be transmitted by mail or wire: even routine business communications in these media may suffice to make a scheme of false dealing into a federal offense.

Filing No. 87, Memorandum and Order at 8 (quoting *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 918-19 (8th Cir. 2001)).

For purposes of the motion for summary judgment, the Court agrees that plaintiff has sufficiently plead and offered evidence of each of the required elements. The conduct is clearly outlined in this Memorandum and Order. The allegations include mail and wire fraud violations and evidence of the same. The alleged scheme was massive, covering

numerous entities throughout the United States. Deception and fraud are involved. These factual questions will be decided at trial.

### d. *Fraudulent Concealment*

Under Nebraska law, plaintiffs must prove that: (1) CPAY had a duty to disclose a material fact; (2) CPAY knowingly concealed that fact and the fact was not within Plaintiffs' reasonably diligent attention, observation, and judgment; and (3) Plaintiffs reasonably relied on the fact or facts as they believed them to be as the result of CPAY's concealment. *See Knights of Columbus Council 3152 v. KFS BD Inc.*, 791 N.W.2d 317, 334 (Neb. 2010). "In order to state a claim for fraudulent concealment in Nebraska, plaintiff must allege: [1] a duty to disclose a material fact; [2] knowledge of the fact; [3] concealment of the fact; [4] that the fact was not within the plaintiff's reasonable attention, observation and judgment; [5] that defendant concealed the fact intending that plaintiffs act or refrain from acting; [6] and that plaintiffs reasonably relied on those facts; and [7] that plaintiffs were damaged by the action or inaction of the concealment." *Custom Hair Designs by Sandy, LLC v. Cent. Payment Co., LLC*, No., 2019 WL 3342206, at *5 (D. Neb. July 25, 2019) (numbering in brackets added) *citing Knights of Columbus Council 3152 v. KFS BD, Inc.*, 791 N.W.2d 317, 334 (Neb. 2010)).

Defendant first contends it had no duty to disclose, as it is not a fiduciary. *Nat'l Am. Ins. Co. v. Constructors Bonding Co.*, 719 N.W.2d 297, 303 (Neb. 2006). Further, defendant argues that its fees were adequately disclosed to the plaintiffs and appropriate notices of fee increases were also adequately disclosed. Third, defendant contends that plaintiffs are unable to show justifiable reliance. Plaintiffs, argue defendant, admit they did not review their Merchant Applications or the relevant Terms and Conditions. The

plaintiffs, state defendant, cannot both ignore the terms and also claim that CPAY concealed them. *See Knights of Columbus Council 3152*, 791 N.W.2d at 334; *Lucky 7, L.L.C. v. THT Realty, L.L.C.*, 775 N.W.2d 671, 677 (Neb. 2009).

Plaintiffs contend that the intentional fraud and deceit committed by the defendant is sufficient to create material facts for trial. These discount rate increases on merchant accounts happened often and material information was omitted. Nowhere, argues plaintiffs, does it say that the discount rates can or will be increased for CPAY's business need. The plaintiffs contend that defendant imposed fees, for example the noncompliance fee,[10] with no service in return. CPAY imposed a TSSNF Fee on 84,953 separate merchants from January 2012 to October 2018 and collected $18,565,125.28. (Arthur Olsen Report, Filing No. 91-23, at ¶¶ 24-25. Merchants, including plaintiffs, collectively paid CPAY $36,969,924.00 for PCI Noncompliance Fees from January 2012 through October 2018. *Id. See e.g., Adams v. American Cyanamid Co.*, 498 N.W.2d 577, 591 (Neb. Ct. App. 1992) (finding provision procedurally unconscionable because its importance was not understandable to a layperson and would "permit the defendant to escape all consequential responsibility" and leave the plaintiff without "substantial recourse for his loss").

The Court agrees that CPAY had a duty to disclose material facts to the merchants, even in the absence of a fiduciary duty. *Streeks, Inc. v. Diamond Hill Farms, Inc.*, 605 N.W.2d 110 (Neb. 2000), overruled on other grounds by *Knights of Columbus Council 3152 v. KFS BD, Inc.*, 280 Neb. 904, 791 N.W.2d 317 (Neb. 2010); *Cyclonaire Holding Corp. v. Baker*, 2017 WL 3206894, at *8 (D. Neb. Apr. 11, 2017) (whether or not there

---

[10] This fee was a penalty to the merchant for failing to "attest" every year they are in compliance with all PCI (payment card industry) standards. (Chang Dep. Tr. at 254:1-12, and 259:15-19, No. 91-3).

was a fiduciary relationship between the parties in this case is not dispositive of the duty to disclose); *see also Knights of Columbus*, 791 N.W.2d at 331–32 ("When a party makes a partial or fragmentary statement that is materially misleading because of the party's failure to state additional or qualifying facts, the statement is fraudulent."); *DeNourie & Yost Homes, LLC v. Frost*, 854 N.W.2d 298, 312 (Neb. 2014) ("If a defendant's partial or ambiguous representation is materially misleading, then ... the defendant has a duty to disclose known facts that are necessary to prevent the representation from being misleading").

The Court also agrees that there is a genuine issues of material fact for trial regarding fraudulent concealment. *See, e.g., TCF Nat. Bank v. Mkt. Intelligence, Inc.*, 812 F.3d 701, 711 (8th Cir. 2016) ("Generally, "fraudulent concealment and a plaintiff's due diligence are questions of fact unsuitable for summary judgment"). Plaintiffs had every right to justifiably rely on the billings, not knowing there was a scheme to defraud or concealment of certain facts and fees. "That is, if a defendant's partial or ambiguous representation is materially misleading, then the defendant has a duty to disclose known facts that are necessary to prevent the representation from being misleading." *Knights of Columbus*, 791 N.W.2d at 332-33.

THEREFORE, IT IS ORDERED THAT:

1. Plaintiffs' motion for class certification, Filing No. 89, is granted;

2. The Court certifies the following class:

All of CPAY's customers that, from January 1, 2010, to the present (a) were assessed the TSSNF Fee (a/k/a TSYS Network Fee); (b) were assessed the PCI Noncompliance Fee; (c) had their contractual credit card discount rates

increased above their contractual rate by CPAY; and/or (d) had credit card transactions shifted by CPAY from lower-cost rate tiers to higher-cost rate tiers.

3. The Court appoints the following attorney as lead counsel for the proposed class:

   Tyler W. Hudson
   Wagstaff & Cartmell LLP
   4740 Grand Avenue, Suite 300
   Kansas City, MO 64112

4. Defendant's motion to file a sur-reply brief and/or strike evidence, Filing No. 129 with reference to Filing No. 89, is denied.

5. Defendant's motion to strike the testimony of Karl J. Borden, Filing No. 99, is denied.

6. Defendant's motion for summary judgment, Filing No. 117, is denied.

Dated this 11th day of February, 2020.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge