IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

CUSTOM HAIR DESIGNS BY SANDY, LLC, on behalf of themselves and all others similarly situated; and SKIP'S PRECISION WELDING, LLC, on behalf of themselves and all others similarly situated,

Plaintiffs,

vs.

CENTRAL PAYMENT CO., LLC,

Defendant.

Case No. 8:17CV310

Lincoln, Nebraska
February 26, 2019

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CHERYL R. ZWART
UNITED STATES MAGISTRATE JUDGE

TRANSCRIBER: Ms. Lisa Grimminger, RDR, CRR, CRC
100 Centennial Mall North
Room 587
Lincoln, NE 68508
(402) 437-1908

Proceedings recorded by electronic sound recording, transcript produced with computer.

A-P-P-E-A-R-A-N-C-E-S

FOR THE PLAINTIFFS:

Ms. Melody R. Dickson
Mr. Tyler W. Hudson
Wagstaff Cartmell Law Firm
4740 Grand Avenue
Suite 300
Kansas City, MO 64112

FOR THE DEFENDANT:

Mr. Jonathan R. Chally
Mr. Brandon R. Keel
King Spalding Law Firm
1180 Peachtree Street, N.E.
Atlanta, GA 30309

Mr. Kenneth W. Hartman
Baird Holm Law Firm
1700 Farnam Street
Suite 1500
Omaha, NE 68102-2068

(At 12:01 p.m. on February 26, 2019; with counsel present by telephone:)

MR. HARTMAN: Good afternoon.

THE COURT: Good afternoon. How are you?

MR. HARTMAN: Ken Hartman, Judge. How are you?

THE COURT: I am grand. And yourself?

MR. HARTMAN: Doing all right. The roads are getting a little better to get downtown so that's good.

MR. CHALLY: Hi, everybody. This is Jon Chally from King and Spalding.

THE COURT: Hello, Jon.

MR. HUDSON: Hello, Judge. How are you?

THE COURT: Good.

We are on the record in Case Number 8:17CV310. This is Custom Hair Designs by Sandy, LLC, and others versus Central Payment Company, LLC.

Counsel, please enter your appearance beginning with counsel for the plaintiff.

MR. HUDSON: Tyler Hudson and Melody Dickson for the plaintiffs.

MR. CHALLY: Your Honor, you have Jon Chally and Brandon Keel from King and Spalding for the defendant, and as you know, we also have Ken Hartman also representing Central Payment.

THE COURT: Okay. And do we have any -- okay. So

Skip's Precision Welding, LLC, who represents them?

MR. HUDSON: Ty Hudson and Melody Dickson of Wagstaff and Cartmell.

THE COURT: Okay. So you represent both plaintiffs?

MR. HUDSON: Yes, Your Honor.

THE COURT: Okay. I may have missed that when you entered your appearance to begin with. All right. And Mr. Hartman is not on; right?

MR. HARTMAN: I am here, Your Honor.

THE COURT: Oh. Hello, Mr. Hartman. How are you today?

MR. HARTMAN: I'm doing all right, Judge.

THE COURT: Okay, all right. Now I'm getting my sea legs back under me. Let's hear what this dispute is about.

MR. HUDSON: Thanks, Judge. This is again Ty Hudson for the plaintiffs. We have served document requests and are seeking the transactional data or fee data for the charges that CPAY has imposed on merchants. So this case is a -- is a class action in which the plaintiffs are merchants who are paying fees to a merchant acquirer, a company that offers credit card processing services; so they act as a middleman for -- to -- to facilitate credit card transactions.

THE COURT: Okay.

MR. HUDSON: And so in this case what -- the case was originally filed as a breach of contract case alleging that

there were particular fees that were being charged that were in excess of the contract rates. So when merchants signed up with Central Payment, or CPAY is what it sometimes referred to itself as, they signed an agreement, a written agreement that lays out certain fees that the -- that CPAY is going to charge them, and our two plaintiffs are two merchants who had particular fees that they were charged that were not agreed to in the contract.

We then went forward in the class certification phase of the case and obtained some discovery, and once we obtained that discovery, we filed an amended complaint, and we've now added claims under RICO, the federal racketeering statute, and fraudulent concealment under Nebraska law. So the scope of the case has expanded, and what we're asking for in the class certification phase is the fee data going back to the inception of the company. So it's our understanding that CPAY has kept data going back to March of 2006. They've, for the most part, produced all of the data from January of 2012 until the present.

What we're asking for, Your Honor, is to go back to the beginning of the company, and the reason that this information is relevant is really twofold. One, in this class certification phase, what we're trying to analyze is the scope of the case. So for the RICO claims and the fraudulent concealment claims, we're trying to figure out which -- what

fees were imposed on which merchants and then how did the company operate.

One of the things that we've alleged -- and I'll give you one example. There was a TSYS fee that was added, I believe, in 2012 -- two -- 20 -- sorry, 2014. There was a fee, and one of the -- one of our contentions is, is that that fee was -- was added not because CPAY had -- had any increased fees and instead it was just a fee that was -- that was created to extract excess profits from merchants. In other words, it wasn't a pass-through where Visa or Mastercard or one of the credit card companies had increased their costs on CPAY. Instead it was CPAY just creating a way to make more money at the expense of merchants.

And so one of the things -- the reason why the fee data is relevant is because if we go back in time, we can see how this company operated and what fees were they adding or not adding at various points in time that will give us an insight into how they operate as a company. In this case we're not -- we're not necessarily saying that this is going to be data that's going to be admissible at trial. That would be putting the cart before the horse. All we're -- all we're saying is, is that the data ought to be produced in the case so that we can see the full scope of how the company operated. I think even if we didn't have the new RICO and fraudulent concealment claims in the case, it would still be relevant for that reason.

I think it becomes a really easy decision on relevance when you have RICO and fraudulent concealment, because those are fraud-based claims where the discovery rule applies, and so potentially we need to see this data in order to determine the scope of our class and how far the claims go back in time. So that's -- those are the reasons why we believe that the information is relevant to the claims currently in the case.

On -- and then, as to the second step, proportionality, in this case really there's been no argument. We really actually tried to limit the information that goes back prior to 2012, and all we're asking for for the class certification phase is the fee data, which if the company, you know, was -- was operating in a legitimate or correct way, this should be data that's just sitting on a database there, and it just with a few keystrokes ought to be able to be exported out and produced in this case. If it's more complicated than that, then that is -- in itself makes it relevant to the case, because it gives us insight as to how the company was operating, and obviously, with fraud claims in the case, we're trying to determine the -- how this company operated so...

And in terms of proportionality, while I know that the defendant's submission said that it's not proportional to the needs of the case, we've not -- they've not come forth with any details on expense or time-consuming or anything else that would cause it to be proportional. Again, we think this

strikes the right balance at the class certification phase of allowing us to see the fee data, and that will give us insight into what the company charged and how they operated for purposes of making decisions on class certification, and it's information that really goes right to the heart of the claims in this case.

If you have any further questions, I'm happy to answer them, but I think that's -- I think those are the -- the core reasons why we think this information should be produced.

THE COURT: All right. Let's hear the response.

MR. CHALLY: Thank you, Your Honor. This is Jon Chally on behalf of the defendant. Just one procedural clarification. Mr. Hudson is correct that they have amended the complaint to assert some additional allegations, specifically RICO and fraud -- fraudulent concealment claims. Mr. Hudson failed to point out, however, that we have a motion to dismiss pending as to those claims. And while they are, I suppose, in this case in the sense that they are in a pleading that we have challenged as not sufficient to state the claim, it is a far cry from them actually being in this case for broader purposes, but I will say that that isn't alone the reason why we have resisted this discovery.

We've resisted this discovery because despite what Mr. Hudson is saying as to the scope of this case now, it's completely inconsistent with what he has alleged to be the

scope of the case in the complaint. If this case relates to the claims of two named plaintiffs who started interacting with Central Payment no earlier than 2015, that alone is the scope of this case for now. Until the class is certified, we're focused on the named plaintiffs' claims; so that would justify taking discovery back only to 2015.

Now, we have acknowledged that there is a class element to this case, and we have agreed to provide information that is important to evaluating class certification questions, but we're not shooting in the dark as to the time period the plaintiffs alleged for purposes of even the class. The plaintiffs themselves said in both the original complaint and in the amended complaint that the applicable time period for the class is that which reflects the applicable statute of limitations.

The longest statute of limitations that is at issue in any of their claims, whether the new ones or the original breached contract, is five years. And so what we have agreed to do is produce to them data that shows all of this transaction level data that they've asked for going all the way back to January 1, 2012; so that covers every aspect of what they say their class covers. It covers every aspect of what they say their plaintiffs cover. It even covers the specific fee that Mr. Hudson mentioned today, this fee that he says was created in 2014.

If it was created in the way he's suggesting, the data he's already got is going to show where that data came -- or excuse me, where that fee came from and how it was applied from that point going forward. So what they're really saying is they're trying to amended the complaint and allege some basis for tolling through a statement, a three-paragraph statement seeking additional discovery, and we just don't think that's proper, Your Honor.

If they think they have a basis for alleging that the statute of limitations was tolled and the discovery rule applies so as to extend their case beyond what they have currently pled in their complaint, they have to allege it, and they have to allege it in a way that -- that satisfies the requirements of Rule 8 and in this instance would satisfy the requirements of Rule 9(b), and they have to get past the motion to dismiss those allegations, which we expect that we would file if they were to attempt to do that, and they've done none of that.

Instead they're just saying I want -- I want all of the transaction level data that goes back to the beginning of this company even though they haven't even tried to plead a case that would justify implicating all the information. So what we have said in resisting that discovery is, one, you have enough. We have given you a significant amount of documents and information in this case, and as to fee data, we have given you

everything we have been able to collect from January of 2012 to -- I believe it's 2000 -- October of 2018.

We've given them a significant amount of fee-related data, and what we've said I think has been fairly transparent is that isn't just a couple of keystrokes, that it is data. I want to be clear about that. It is not a hard document that someone has to go to an off-site storage to try to collect. It is data, but it is a significant amount of data that requires, to our understanding, multiple days. It's kind of an extraction process.

So there is an expense, there is an effort that is required to collect the additional data that they're seeking. That is to be balanced against the value of that data in this case, and the value of that data in this case is virtually nothing, because they haven't even pled that they can pursue a claim, whether on behalf of the plaintiffs or on behalf of the class, that goes back as far as they're now suggesting.

So we think, to -- forgive me for using a term that I'm sure you have heard all too often in the discovery context, but we do think this is a fishing expedition. There is no basis -- there is no pled basis for seeking this information. If they can allege a basis for it, they're free to do so. They're free to seek to amend the complaint further and allege that basis, and if that is sufficient to meet the rules requirements, then we have a different story. But as of now we don't think

there's any basis to demand that we produce this additional data.

THE COURT: Any rebuttal?

MR. HUDSON: Yes, Your Honor. Thanks. So I guess two points. One is we're -- it's a discovery dispute, and we're in the discovery phase of the case. We're trying to figure out -- and in particular we're in the class certification phase. We're trying to figure out what -- what class can be certified, and how do we figure out whether or not we can assert damages using common evidence? And one of the -- for -- and I'm just giving you an example. Even if this was just a breach of contract case, for example, one of our allegations is, is that they've increased the fees over time beyond the contractual rates.

Well, how do you figure out whether or not the fees got increased? You've got to look at the baseline. And so in this case the way that this company keeps their data is by merchants, you know, month by month by month, and so over time they're billing these merchants every month. I mean, in order to be able to go back and look at the data just -- just on the breach of contract claim, this data would be highly relevant just to look at the history of the fees that were being charged for each merchant for -- for purposes of trying to figure out when these increases were occurring, how they were occurring.

So just in that world, if we were just operating in that

world, this would be highly relevant data that would not involve a fishing expedition but instead would be, again, focused completely on trying to get our arms around how the company increased fees over time or added fees over time. So even if -- even if they -- even if their argument were right on the statute of limitations, right on the scope of the case, and we were talking about just a breach of contract case going back five years to 2012, I would say that this would be highly relevant information again for just trying to figure out damages methodologies, because we're limiting it just to the data itself.

We're not asking for any, you know, work product beyond that. We're not asking for emails, we're not asking for -- for anything else, just the data itself that should be housed in databases within the company. But moreover, you know, the case has changed and it is expanded, and there is a fraud claim and -- a fraudulent containment claim and there's a RICO claim and those -- there -- we don't have to establish tolling.

The discovery rule applies, and that's what we made clear in the complaint is, is that the case is as broad as the applicable statute of limitations. And so what -- what -- what I hear opposing counsel saying is that because we've only got two plaintiffs and their claims relate to 2015, then we don't get any discovery broader than that and we don't get any discovery on anything going back further in time on our fraud

claim or our RICO claim, especially again for purposes of class certification. That doesn't make any sense.

We've got to be able to figure out and see the evidence in order to define the scope of the case and figure out what's going on. So I think that makes this an even -- an easier -- an even easier decision because of the inclusion of those claims in the case. That's -- we disagree that the longest statute of limitations goes back five years. It comes -- it involves when the fraud was discovered. And in the first instance what we've got to analyze for purposes of figuring out what our class is, is what fees did they charge going back in time? And if we don't have that, then we can't make any of those assessments and determinations.

And that brings us to the proportionality point, and that's the point is we've tried to make this very proportional by zeroing in on the -- the absolute core information that we would need in the class certification phase to make this decision, and that's the data itself. I mean, that's the -- that should be the least intrusive, the easiest to collect, and the most insightful for the scope of this case and allow us and our experts to analyze the information, to make informed decisions on how to define the class and how to explain who the class members are and what the common evidence is that exists for purposes of class certification, and without the data we're not going to be able to do that, and it would handicap our

ability to do it.

We've -- we've kept it -- kept it narrow at this point in time, and so I think this -- in this situation in class certification, the data is the right balance, and we should be entitled to -- to receive it and review it.

THE COURT: All right. I don't hear that the defendants are saying that the data isn't the right thing to ask for. I hear what they're saying is the scope is inappropriate because it goes all the way back to the inception of the company, and they believe that giving you the data from January 1st of 2012 through when they responded to it, which was late in 2018 -- I didn't write down the exact date, but that that is the data that you need. So on that grounds I'm -- I'm not buying your argument that they're somehow objecting to giving you data. They're just objecting to the time frame.

Am I right on the defendant's side?

MR. CHALLY: Yes, Your Honor, you're exactly right. I would add just very briefly that we're not fighting over data. That data has been produced. We are fighting over the time period, as you suggested. I would say that Mr. Hudson's suggestion that the data is somehow the key to understanding the claim is a misapprehension of this case. This case is the -- the merchants, the members of the class, agreed to a contract that Mr. Hudson believes based in certain fees, and then Mr. Hudson contends that the defendant has charged certain

different fees over time.

THE COURT: Uh-huh.

MR. CHALLY: Well, putting aside the fact that the merchants, the plaintiffs here, actually saw those fees as they were charged over time, the -- the two relevant data points there are the initial agreement and then the transactions level data that they can assert a claim on considering the applicable statute of limitations. You do not get to review transaction level data from prior to the scope of the statute of limitations just to sort of see whether it's consistent with what you had previously agreed to.

The claim here is application says certain fees, and then from whatever time the law allows the plaintiffs to assert the claim, were those fees consistent with what the plaintiff believes it agreed to? So you don't need the transaction level data to address the question Mr. Hudson is focused on. But to address your specific question, we aren't disputing whether or not fee data can be discovered here. It can be. It has been. We're talking about whether we need to produce an additional seven years' worth of data.

THE COURT: Okay. I'm looking at the amended complaint, and it's filing number 49, and it is correct it is subject to a motion to dismiss at this point in time. Since it is subject to a motion to dismiss, while it is out there as the pleading, it is not necessarily the operative pleading right

now, because it may well be that Judge Bataillon finds that there is no claim for RICO. It is very difficult to allege a civil RICO claim. It may also be that he finds there is no claim for fraud.

And more importantly, as to the class issue, looking at the class allegation, which is in paragraph 212, which is on page 53, it's "All customers in the United States that paid a fee to Defendant that is higher than those set forth in the Merchant Processing Application & Agreement." It seems like the data points as defendant argues are: What does the agreement permit, and what did you charge?

And going back, if it -- if this is a fraud case or a RICO case, even if we would to -- were to do that, I believe the statute of limitations would be four years. Going back on a contract claim, it would be five years, and going back five years before the case was filed would be August 17th of 2012. They're giving you data for the seven months even before that, and it strikes me that you can compare that data to the Merchant Processing Application & Agreement that is at issue and decide where -- whether anything has been overly charged or charges have been imposed that were not part of that agreement.

I'm not understanding why it makes a difference if somebody prior to August 17th of 2012 had a better agreement, had a different agreement, or that the company changed its agreement over time.

I'm not understanding that argument by the plaintiff so I'll give you one more crack at it, but for right now you've got to explain that to me before I'm going to grant your motion.

MR. HUDSON: Thanks, Judge. I appreciate that. Yeah. I think, well, a couple things. One, in terms of the scope of the case, I guess it's extremely important to us to understand where we are and what -- what -- what claims are in the case or not in the case for purposes of class certification, because we've got deadlines coming up in a couple months, and our assumption was -- was that because we filed claims that include -- you know, in other words, we filed a complaint, an amended complaint that includes claims for RICO, fraudulent concealment, breach of contract.

So we're under the assumption that we're moving forward and need to, in about two months, create expert reports; and then I believe it's in April, April 4th, file a class certification motion that would include certifying classes on all three points. So that's -- that's kind of -- I guess is -- is an aside, but I think it's important on those claims.

I think in terms of your -- you're absolutely right, Your Honor. The dispute is not about whether or not we get the data. It's the scope of how much data we get. And Mr. Chally explained it as we need to just look at the initial agreements, and then we need to look at the transactional level data during

 the pertinent time period for when the breach of contract -- you know, the breach of contract statute of limitations would exist. Even that, though, Judge, we don't have the initial agreements. They haven't produced all of the initial agreements for the merchants in the class. There's like 40,000 merchants in this class, and that's why --

THE COURT: Well, pause, pause. Are you -- you have your own clients' agreements; right?

MR. HUDSON: Yes, we do.

THE COURT: Are you saying that the 40,000 merchants that you purport to represent may all have different contracts? And how -- if that is true, how in the world could this ever be a class?

MR. HUDSON: Well, Your Honor, that's why -- that's what -- that's why we're trying to take discovery during the class certification phase to try to figure out these issues.

No, we would say no, we don't believe that the -- that the merchants all have different contracts with different terms. We think what's critically important is to look at the transactional data, and this is why the most efficient way to analyze this issue is to look at the data, because each time a merchant signs an agreement, the company has policies and procedures, and the practice of what they're supposed to do is then go and input that information on the fees that are to be then charged on a merchant-by-merchant basis into a database,

and that's what we're asking for is, is if they will produce the data going back in time.

I mean, for example, if a merchant joined the company in March of 2006 at its inception and went forward in time, if they will produce the data, then we'll be able to see here's the baseline which is where this customer then was inserted into their database. And then for purposes of analyzing their damages, then you can take that baseline and look and see where there were increases that are inconsistent with the contract. But that's why -- that's why it's our contention that the core of this dispute, even if we're talking about just a breach of contract case, is the data itself's not the critical component. It's we've got to be able to see a baseline.

And that's, Your Honor -- I mean, that's the issue is our -- our experts can -- can testify or, you know, issue reports on what they see from our two class representatives from the way that their agreements are set up and the data and the information, but to say -- but to say anything larger about the class and make statements about the class, we've got to see how the company kept the data and be able to go and analyze that, because that's what we need.

To get the class certified, as you know, Your Honor, is we've got to be able to point to common evidence to support our claims, and so that's why this data provides us what we need and gives our experts the foundation to go and analyze those

issues and determine the scope of the case and -- and what's pertinent to the claims.

And I think -- you know, and I know I -- I'm hearing loud and clear what you're saying about RICO claims and fraudulent concealment, but, I mean, on those two claims in particular, the discovery rule would apply, and so I think those would definitely expand the scope of the case, and if we're expected to go and file class certification motions and attempt to certify those claims on a classwide basis at the April 4th deadline -- I'm sorry. If our experts are supposed to be drafting reports that are providing the foundation and that's all to be done by April 4th, we need the data in order to go and do that and go forward with that so --

THE COURT: I'm not --

MR. HUDSON: And --

THE COURT: I'm not understanding that. It seems to me that your class is going to be limited to the people whose claims aren't barred by the statute of limitations. As of right now you've got more data than -- than is included within the statute of limitations. You've got a contract for each of the people you hope to represent, and if you don't have that contract, then -- then that's a whole different thing, but that's not what you're asking for today. You're asking for today all of the data to see how your -- the clients that you currently represent, which are the only -- only the two named

plaintiffs, you're asking for all of the data for everybody they've ever done anything for since the inception of the company, and I don't -- I don't see how anything that is beyond the statute of limitations is relevant. Even as to figuring out who's going to be in the class and whether the people that are in the class were somehow overcharged, I -- I don't see it so --

MR. HUDSON: Judge, how do we establish the baseline, then? For example, even if we were restricted to a breach of contract claim, how do we establish the baseline to figure out whether or not the other class members were overcharged compared to -- to what was initially agreed to in the agreement?

I mean, in other words, if you're saying for purposes of class certification we can take our two named plaintiffs, look at their representative examples, and then say we can do the same thing and make the same analysis on the merits for the entire class and not going to be --

THE COURT: I'm saying -- I'm saying this is all governed by a contract. Look and see whether they were charged more than they were supposed to under the contract and -- and that doesn't -- we're not looking at company trends. We're looking at a contract. And I don't understand why you need to see what they charged in 2006 to know whether they violated a contract in 2012. I don't get that.

MR. HUDSON: Well, for one reason, because one of the allegations is, is that they were making increases in rates over time, systematically increasing the rates, and so when you look at the fee data going back in time, you -- you can see the baseline. I mean, in other words, is the expert -- our experts -- and again, maybe I'm misunderstanding in the District of Nebraska the scope of what we need to do for purposes of filing class certification motions but --

THE COURT: Well, we follow the Federal Rules like everybody else does so I mean -- so you're not misunderstanding. I -- what I'm saying is you can't -- I don't understand, given that if your claim is and your class is that the customers were charged -- that they paid a fee to defendant that is higher than those set forth in the Merchant Processing Application & Agreement, which is how you define the class in paragraph 212 on page 53 of the current amended complaint, I don't understand how you need a baseline of what was charged in 2006 to know whether they were charged beyond what the agreement allowed them to be charged in 2012.

MR. HUDSON: And, Your Honor, that may be my fault. I apologize. I probably am not explaining well. What I'm trying to get at is the -- the data -- what I mean by the baseline is the initial input into the computer will be the contractual rate. In other words, under their policies and procedures, they will be inputting into their database the

contract rate initially so -- so instead of having to go and look through 40,000 different agreements and determine what the information is, the transactional data itself that first month that it gets input -- you know, CPAY has policies and procedures that says, you know, step one, the company goes and reaches a written agreement with a merchant.

Then step two is then you take that information, and there's an uploading process into their database. So it's -- it's -- that initial data should be what is consistent with the contract, and what we're saying is then over time -- so that's month one. This baseline gets set in their database which is -- which should be consistent with what's in the contract, but then what we see over time is that there are increases in those fees that are inconsistent with what's -- what's in the contract, and you can see that in the fee data.

So -- so if we're talking about just our contract claim, which I agree, Your Honor, it's a closer call for the contract claim than it would be for the RICO claim or the fraudulent concealment claim, but I think the reason why it's relevant is because the data itself allows you to see -- that first month allows you to see what should be the contractual rate in that database.

MR. CHALLY: Your Honor, if I can just very briefly address that final point.

THE COURT: Sure, uh-huh.

MR. CHALLY: Thank you. Two issues with respect to that. The first is Mr. Hudson is suggesting and is reading policies and procedures that as -- as you -- we would all imagine require some sort of a data entry analyst to include in the system the contractually agreed fees and charges. That's true, but he's reading that to assume that that entry is archived and maintained for an extended period of time. And while we are checking on that, I am not currently aware that that is accessible, that the initial entry is actually archived.

But it really doesn't matter whether it is or not, because if it is, that's information that we would expect we would be able to collect and produce. We're not fighting over whether we would produce even that information. What we are fighting over is whether that information has to go back to 2005.

So if Mr. Hudson's theory on how this data is archived is correct and consistent with what we understand and that it is accessible in a way similar to the rest of the fee data is accessible, something that we don't know just yet, if it is, they will have it for the time period that is applicable based on the plaintiffs' claims, the plaintiffs' individual claims, and the class that's pled in the complaint. So that does not answer -- it doesn't even begin to answer the question of whether we should be producing this additional seven years' worth of data.

THE COURT: I think what he's saying is he needs that additional seven years' worth of data to figure out what the contract was at the outset. Can you address that on the defendant's side?

MR. CHALLY: Yeah. We certainly do believe, Your Honor, that the best evidence in that contract is the contract itself.

THE COURT: Right.

MR. CHALLY: And that is exactly what the defendant should be after and what the plaintiffs should be after, that rather than what a data analyst input, the best evidence of the contract is the contract, and so we would need to be looking at the contract itself. I think that that -- that cannot -- no other proxy for it. Whether you're talking about what a data entry analyst said or what one of the plaintiffs orally articulated to someone else as the appropriate numbers that they agreed to, neither of those things can change the terms of the contract.

The contract is what it is, and you have to look at the contract to evaluate what the contract obligated CPAY to do with respect to -- to the plaintiffs. So I don't think that any other evidence, assuming it exists -- and that's a big assumption at this point -- I don't think any other evidence can substitute for the terms of the contract itself.

THE COURT: Okay. And are you saying on the

defendant's side that you're looking for those contracts that they're -- that -- have they been asked for?

MR. CHALLY: We have produced what the plaintiffs have asked for in terms of the contracts.

THE COURT: Okay.

MR. CHALLY: As I sit here today, I don't recall whether they had a sweeping request for every contract of every merchant from the -- from the time period applicable in this case, but we have produced every contract that has been asked for.

THE COURT: All right. Under the circumstances as discussed, I'm inclined to agree with the defendants *[sic]* on this. I don't believe that going beyond what they've already provided you is relevant in this situation, and it is disproportionate, because by the time they go all the way back into 2006 and into all of these archives and such, there may well be -- they may well be providing you with information that -- for clients that don't even exist anymore so...

So that's my ruling. I'll upload the audio on this. You can appeal from it if you wish to by citing to the audio itself.

Anything else that we need to take up at this time?

MR. HUDSON: Yes, Judge. This is Ty Hudson again for the plaintiffs. We would like to get just some guidance from you, I guess, in terms of our schedules. And it is my

understanding -- and again, I may be under a misapprehension, but that we're in the class certification phase and that we would be expected to be -- to be filing or serving expert reports and then filing a class certification brief in a few months relating to all three claims in the case.

Also, in connection with that, I guess what we were looking for is just we were -- we were going to take the depositions of a class representative and then also maybe one or two fact witness depositions, and I was just concerned -- different districts do it different ways -- in terms of our ability to take the deposition of the same witness more than one time.

So I guess just in terms of the scope of the case, we were hoping to get some guidance on that to make sure that we were doing things as efficiently as possible and consistent with the Court's expectations.

THE COURT: Well, whether a class is certified or not, you have a plaintiff; right?

MR. HUDSON: Yes.

THE COURT: So why would we limit the plaintiffs' depositions to just class certification questions when, with or without a class, the plaintiff is or is not going to go forward?

MR. HUDSON: Yeah. That's a great point, and I don't think we've been on our side suggesting that we would limit the

depositions of our plaintiffs. I guess I was more focused on taking the depositions of the defendants *[sic]*, you know, in other words, their class representative and then a couple of their key fact witnesses who are involved in running the company.

THE COURT: I don't know if the defendants *[sic]* have class representatives.

MR. CHALLY: Yes, Your Honor. It might be helpful if I explained this just a little bit.

THE COURT: Okay.

MR. CHALLY: I think Mr. Hudson is referring to corporate representatives --

THE COURT: Oh, okay.

MR. CHALLY: -- and in that context we certainly do. This issue arose because the plaintiffs issued a 30(b)(6) notice that sought corporate representative testimony of our client, and the notice itself was, you know, as you would expect in an instance -- in a case like this, fairly broad and covered topics that we thought were related to both call them class issues and merits issues.

And to properly respond to that, we identified a witness who the document production that has been conducted in this case reveals to be -- reveals to have knowledge that sort of spanned the wide aspect of the claims here, and so we indicated to plaintiffs' counsel that we are happy to present this

particular individual as a corporate representative, we would request that you, you know, make an effort to take his deposition in that capacity, but also in the -- in his capacity as a fact witness individually based on his personal knowledge, and that we try to consolidate that so that we only take his deposition one time.

And -- and the -- what we heard in response -- and Mr. Hudson can certainly address this, but what we heard in response was we believe that the case is now narrowly focused on class certification issues; so what we intend to do is ask only those questions of this witness that are applicable to our motion for class certification and then reserve the ability to come back to this witness after the resolution of the motion for class certification and take his deposition again.

THE COURT: Yeah.

MR. CHALLY: And -- and --

THE COURT: That --

MR. CHALLY: -- we indicated that that was -- we objected to that, and so I believe that's the clarity he is driving at.

THE COURT: Yeah. And that may be how they do it in different districts, but in our district what -- you take the deposition of a person once you're going to use them. You take it on all issues that you can at one time. Obviously, a person who is sitting as a 30(b)(6) representative is, for all

practical purposes, the company at that point in time, which is different than being an individual. That's up to the parties as to whether they want the -- that witness to sit once or twice, because they are truly testifying in two separate capacities.

But as I said before, I think the same principle applies. There are two plaintiffs in this case whether a class is certified or not, and as to the discovery as to those two plaintiffs, let's get it done along with whatever you need to get done to determine whether you're going to request class certification.

All right? Does that answer your question?

MR. HUDSON: Yeah. I mean, that -- that is helpful. I mean, I guess, for purposes of class certification, are we -- are we -- we have a first amended complaint that includes claims for breach of contract, RICO, and fraudulent concealment. Judge Bataillon hasn't ruled on the motion to dismiss the RICO or fraudulent concealment claims, and so, I mean, my assumption was we would go ahead and move forward with class certification on all three claims pending the outcome of his decision.

Should we -- should we think about, you know, extending the schedule to wait for him to rule before we file class certification briefing?

THE COURT: Well, what is the difference in the scope

of your questioning?

MR. HUDSON: That gets back to what we were talking about earlier today. I mean, in terms of -- a RICO claim and fraudulent concealment are -- are pretty different than a breach of contract in terms of just -- you know, I mean, in other words, RICO would involve a scheme to defraud that involves an enterprise and just, you know, a significantly different level of analysis in terms of -- of how you would -- how you would walk through the common evidence to prove each one of the elements of those claims.

THE COURT: Okay. So just a minute.

I'm checking progression schedules here so hang on. I'm still with you. I'm just checking.

You amend them so many times on these kind of cases that after a while it's hard to find our own orders.

MR. HUDSON: Yeah. It's docket number 58, Judge, on December 26th.

THE COURT: Well, that's the current one. What was the original one? 'Cause we have an amended one, and I'm not seeing the original one so...hold on a second.

MR. CHALLY: Your Honor, I was looking for that. I think it may actually be reflected in our planning report. Let me -- let me pull it up.

THE COURT: Okay. So maybe we didn't put out one that had...

MR. CHALLY: Yeah. It is in the original planning report, which is docket number 19.

THE COURT: Got it.

Well, you know, I don't like moving all of these deadlines down the road. I'm going to ask a real simple question. Why did you wait so long to try to add RICO claims and concealment claims in this case?

MR. HUDSON: Because we didn't get the documents. It took a long time to get documents produced, and then we reviewed them, and then we found the evidence, and then as soon as we found the evidence, we went and filed an amended complaint that added, you know, 20 pages of factual allegations relating to what we found, because obviously fraud requires intent and planning and things, and so we didn't have the evidence to originally allege that, but once we found it in discovery, we quickly amended.

THE COURT: Okay, all right. So we've got -- on the motion to dismiss, that was fully submitted, if you go with the reply, January 30th. And then there's a motion to strike improper evidence, and there's a response to that.

So even at the outside, it's fully submitted as of February 11th. So we'd be looking at, crossing our fingers, for April 11th time frame of getting a ruling on the RICO issue and the fraudulent concealment claims. What is our current -- okay. Going back to number 58.

If I move those deadlines for the expert reports and the disclosures and the deposition dead- -- well, the deposition deadline isn't until June 10th. You should have a ruling by then. I don't know that there's a reason to move that deadline for sure. You might want me to move the deadline for identifying expert witnesses and for expert witness disclosures, because the expert witness disclosures are April 4th and May 5th, but what deadlines is the plaintiff proposing that I move while you await a ruling on the RICO and the fraud claims?

MR. HUDSON: Those rulings. What you just said, the experts. The expert reports and the class certification briefs.

THE COURT: Okay. What is the defendant's response to that?

MR. CHALLY: Your Honor, we -- I don't have any issue with the -- with moving the deadlines for identifying experts and providing expert disclosures or reports. I do have some concern over moving the briefing deadlines for class certification. And I want to be clear that while we -- we do have a dispute over the time period for the fee data that you have addressed and resolved, we are not refusing to produce documents or refusing to present witnesses to address those contentions that go to the RICO or fraud-based claims; so it's unclear to us how this current schedule is tying the

plaintiffs' hands behind their back.

I take your point that they may want to know, and as do we, whether these claims are actually in the case or dismissed before they file a motion for class certification, but they're likely to have that, seeing as how their deadline is June 15th. If they'd like some additional time to make sure their experts are addressing those claims, I don't have an objection to that. I would think that they can do that, meaning their experts can address these aspects of these claims now with the document data that they have and don't see a need for a further delay.

Just to be honest, Your Honor, we just think this case kind of needs to move forward and that the motion for class certification should -- the deadlines for the briefing on the motion for class certifications should remain as they are.

THE COURT: Okay. So the questions on a class certification are commonality, typicality, numerosity, and adequacy of representation.

Why do you need to know whether the fraud claims and the RICO claims are going to go forward to determine those four elements of class certification?

MR. HUDSON: Well, Judge, it impacts the scope of the case. I mean, for example, Mr. Chally, his primary argument earlier today on this call was that the RICO claims and the fraudulent concealment claims aren't in the case, and so all we need to do to figure out whether or not we can get the class

certified is compare the initial agreement to the transaction level data, and so now it feels like he's now -- he's now saying we don't want to -- we don't want to wait on class certification. Everything moves forward.

We're fine with that, but then I think we're entitled to this transaction level data to be able to analyze what this company did over time, because the RICO claim and the fraudulent concealment claims, what we're saying is, you know, if you read the complaint, we included a lot of details related to emails and other evidence that strongly suggests that this company was going and adding fees, increasing fees, and -- and scheming to extract excess profits from these merchants.

And so this fee data, for example, is really lying at the heart of what we're going to need for the -- so -- so, for example, commonality, and I guess I would also point to under a (b)(3) class, which is what we'd be moving for, really predominance is where the fight often is between the plaintiffs and defendants, and so are these individualized issues, or can we use classwide data to prove our claims?

At the core of that is being able to look at the company's transaction level data and what we argued about earlier and be able to say, look, Judge, here's the data that they have, and go and let our experts analyze that data and be able to say, yes, we can use the company's own data, analyze it over time, and be able to show that they were extracting profits and

adding fees and increasing fees inappropriately and contrary to what was agreed to.

And I'd be happy to brief that or show you other cases --

THE COURT: No.

MR. HUDSON: -- or whatever we need to do to show you that --

THE COURT: I am still -- I am still convinced that the -- that the issue isn't -- but it really comes down to it isn't the trends in how they were charging fees. It's what did they -- did they charge something they didn't agree to? I mean, I'm -- and it seems like the agreements are going to govern whether people were overcharged, and if you agreed to pay an exorbitant fee, I don't know what the Court is supposed to do about that.

And I suppose that gets into your thing about, well, was there some sort of concealment about how this was going to be applied or whatever and so I -- I'm not going to go there, and I'm not getting -- and just to be -- just kind of gives you sort of a little taste of this, if -- and this is repeating what I said before, but if all of these merchants have these different agreements and they're all, you know, arm's length agreements that they negotiated at some point in time, or if there were certain types of agreements that were given to certain types of merchants that had certain types of things, or if some agreements were -- were the 2010 version and others

received the 2012 version because that's when they first came on board, all of that is going to be something I care about when I look at the motion for class certification, because then you start looking at the commonality and typicality issues, and it'll all come back to whether or not this -- these -- well, first of all, whether there is commonality and typicality, and secondly, whether the named plaintiffs can represent all or a portion of this global class or U.S. class that you're trying to represent. So just kind of keep that in mind as you go forward.

But in light of your request for additional time, I'm going to give you some additional time. I'm going to give you till May 15th to disclose the reports from your experts. I'm taking out the identification deadline. We're just going to go with reports are due by May 15th, June 15th from the defendant, and the class certification motion needs to be filed by July 30th with the briefing schedule under the rules, and the deposition deadline will be on July 15th, and I'll put that out in an order.

Anything else I can take up for you today?

MR. CHALLY: Your Honor, I apologize for not knowing this off the top of my head, but I would ask that our response to the motion for class certification be due 30 days after the plaintiffs file their motion like the current --

THE COURT: Okay.

MR. CHALLY: -- progression schedule.

THE COURT: Okay.

MR. CHALLY: I believe that's a minor modification from the local rules.

THE COURT: Yeah, that is a modification so...

Okay. We'll go with August 30th.

MR. HUDSON: And then, Your Honor, if we could get 15 days in reply too.

THE COURT: Yeah.

MR. HUDSON: Great.

THE COURT: Okay. So we'll put out an order consistent with that. Is there anything else we can take up?

MR. HUDSON: Not from the plaintiffs, Your Honor.

MR. CHALLY: Nor from the defendant. Thank you very much.

THE COURT: All right. Have a great day, and arise, go forth, and litigate.

MR. CHALLY: Thank you.

THE COURT: Bye.

(1 p.m.-- Adjourned.)

* * * * * * * *

I, Lisa G. Grimminger, certify that the foregoing is a correct transcription to the best of my ability from the digital recording of the proceedings held in the above-entitled matter.

*/s/Lisa G. Grimminger* __________________
Lisa G. Grimminger, RDR, CRR, CRC Date