IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| CUSTOM HAIR DESIGNS BY SANDY, LLC, on behalf of themselves and all others similarly situated; and SKIP'S PRECISION WELDING, LLC, on behalf of themselves and all others similarly situated;<br><br>Plaintiffs,<br><br>vs.<br><br>CENTRAL PAYMENT CO., LLC,<br><br>Defendant. | **8:17CV310**<br><br>**MEMORANDUM AND ORDER** |

## INTRODUCTION

This matter is before the Court on Central Payment Co., LLC's (CPAY) motion to stay class members' claims that are subject to binding arbitration agreements under § 3 of the Federal Arbitration Act (FAA).  Filing No. 187 at 1; Federal Arbitration Act, 9 U.S.C. § 3 (FAA).  Plaintiffs, Custom Hair Designs by Sandy, LLC and Skip's Precision Welding, LLC, on behalf of themselves and others similarly situated, brought a class action against Central Payment Co., LLC (CPAY) alleging breach of contract, civil liability under the Racketeering Influenced and Corrupt Organization Act under 18 U.S.C. § 1964, and fraudulent misrepresentation under Nebraska State law.  This Court certified the putative class, and after the Eighth Circuit affirmed class certification on appeal, CPAY filed two motions.

First, CPAY moved to stay class members' claims, which it argues are subject to binding arbitration agreements.  Second, CPAY moved to amend their answer, so that its answer reflects the purported class members subject to binding arbitration.  Plaintiffs

respond by arguing that CPAY waived its right to arbitration, the arbitration agreement is unconscionable, and Rule 23 of the Federal Rules of Civil Procedure supports invalidating the arbitration agreement.  This Court has jurisdiction under 28 U.S.C. §§ 1331, § 1332 and the Federal Arbitration Act, 9 U.S.C. § 4.

## BACKGROUND

Plaintiffs filed a complaint against the defendant in August 2017.  Since then, CPAY has filed motion to dismiss, a motion for summary judgment, and a motion in opposition to class certification.[1]  Now, CPAY contends that the Court should stay this action, so it can enforce a new arbitration agreement imposed on Current Merchants. Filing No. 188 at 12.  CPAY intends to arbitrate, well after the filing of this action, with an estimated 25% of the class, or 56,290 people, before continuing to trial.  *Id.*  CPAY also contends that it should be able to amend its answer to assert its defense that certain class members' claims must go through binding arbitration instead.

Parties

Plaintiffs represent former and current merchants that contracted with CPAY for payment processing.  The two named plaintiffs, Custom Hair Designs by Sandy, LLC and Skip's Precision Welding, LLC, are from Florida and Arizona respectively.  In their original complaint, they noted they would have rather filed this action in one of those states.  *See* Filing No. 46 at 8, ¶25.  However, Plaintiffs filed in Omaha, Nebraska because the original

---

[1] CPAY appealed this court's order granting class certification, Filing No. 142, to the Eighth Circuit. The Eighth Circuit affirmed this court's order, and CPAY subsequently filed certiorari with the Supreme Court. After Plaintiffs originally waived responding to CPAY's petition, the Supreme Court requested briefing from the Plaintiffs.  The plaintiffs subsequently filed a response brief.  The case was distributed for the Supreme Court's October 29, 2021 conference.  The Supreme Court denied certiorari on November 1, 2021.

contract had a choice-of-law provision that required any party subject to the contract bring their dispute to a court in Douglas County, Nebraska.  *Id.*

CPAY connects merchants with a payment processing service for customers' credit and debit card payments.  They do not process the payments themselves, but act as a customer service link between the people who process these virtual payments (the payment processor), and the person who uses a payment processor for their business (the merchant).  Any merchant that wants to accept credit or debit card payments from their customers' needs a payment processor to connect the merchant to the card issuer (the company that issues the credit or debit card); the card association (such as Visa, Mastercard, or Discover); and the member bank ("BANK").

For a merchant to contract with a payment processor, they must first reach an agreement with the customer service link through an independent contractor.  CPAY hires independent contractors to get merchants signed on to Total Systems Services, Inc. ("TSYS") payment processing.  Filing No. 142 at 2.  CPAY then serves as the customer service link between merchants and TSYS.  TSYS owned roughly 75% of CPAY at the time of filing.  *See* Filing No. 1 at 2, ¶4(c).  Plaintiffs are merchants and former merchants that signed onto CPAY's and TSYS's services through these independent contractors.

The Original Contract

When Plaintiffs and CPAY engaged in business, they signed a merchant application that includes, among other things, an incorporation of CPAY's terms and conditions.  Filing No. 188 at 8.  The terms and conditions included a clause that the agreement "may be amended or modified by BANK effective upon thirty (30) days written notice."  *Id.* at 9.  The original merchant application defined BANK as First National Bank

of Omaha (FNBO), which was CPAY's sponsoring bank at the time. *Id.* Additionally, the merchant application permitted BANK to assign its rights or delegate duties without the prior consent of the Merchant. *Id.* The merchant application also included a waiver provision, where the Merchant "covenants not to bring or participate in any class action against BANK. . .." Filing No. 142 at 6.

There was also a governing Law provision in the Merchant application that stated Nebraska law would apply to any controversy, and any suit must be brought in Douglas County, Nebraska. Filing No. 91-4 at 9. Additionally, each party signing the original contact consented to avail themselves to personal jurisdiction in Nebraska. *Id.* The contract renewed monthly. *Id.* at 6. If merchants wanted to stop processing payments through CPAY, they either needed to give 30 days' notice before the next renewal term or give 30 days' notice before termination and pay an account closure fee. *Id.*

The Arbitration Agreement

In September 2019, Global Payments Inc. (Global) completed a merger with TSYS. As a result, Global became the ultimate parent company to all TSYS subsidiaries. CPAY went through changes to align its company with the uniform standards of a Global subsidiary. For instance, Global replaced CPAY's sponsoring bank, FNBO, with Wells Fargo Bank, N.A (Wells Fargo). Filing No. 188 at 9–10. This replacement process began in June 2020 when each party signed Assumption Agreements that effectively started on October 1, 2020. *Id.* at 10. As a result of this transfer, Wells Fargo agreed on June 24, 2020 to become the sponsoring bank for all merchant contracts CPAY facilitated starting November 1, 2020. In similar practice to FNBO, Wells Fargo later delegated their

contractual rights to Global, which included any rights the sponsoring bank held to modify merchant contracts. *Id.* at 10–11.

Global also updated its terms and conditions for all TSYS subsidiaries and their customers, like CPAY and its merchants. CPAY rolled out the new terms in conditions in two steps. First, in November 2020, all new merchants would sign the new terms and conditions as a part of their Merchant application. Second, CPAY attached a notice to the current merchants' February 2021 billing statement to inform them about the upcoming changes to their terms and conditions. Filing No. 190-1 at 6–7, ¶27–¶29. The notice read:

> From time to time, TSYS must update the terms of your merchant agreement to address regulatory and industry changes and other considerations. As such, this message is to notify you that, effective April 1, 2021, the terms of your merchant agreement are being replaced with the updated version (Merchant Agreement v21.1020), located at https://www.tsys.com/documents. This change will have no impact on your pricing or product functionality currently in place.

Filing No. 188 at 12. By April 1, 2021, all CPAY merchants would be subject to the new terms and conditions if they "chose to continue processing through CPAY after receiving thirty days' notice that their agreements were being amended." Filing No. 188 at 7–8. This would be the first arbitration agreement that applied to merchants regarding their relationship with CPAY.

The updated terms and conditions made many changes to the business relationship between CPAY and Current Merchants. The updated terms and conditions added an arbitration agreement that stated:

> ANY DISPUTE OR CLAIM ARISING OUT OF, RELATING TO, OR IN CONNECTION WITH THIS AGREEMENT OR THE RELATIONSHIPS WHICH RESULT FROM THIS AGREEMENT SHALL BE RESOLVED BY BINDING ARBITRATION, RATHER THAN IN COURT; HOWEVER,

MERCHANT MAY ASSERT CLAIMS IN SMALL CLAIMS COURT IF (1) THE CLAIMS QUALIFY FOR SMALL CLAIMS COURT; (2) THE MATTER REMAINS IN SMALL CLAIMS COURT AT ALL TIMES; AND (3) THE MATTER PROCEEDS ONLY ON AN INDIVIDUAL (NOT A CLASS OR REPRESENTATIVE BASIS). ARBITRATION DOES NOT PROCEED BEFORE A JURY AND MAY INVOLVE MORE LIMITED DISCOVERY THAN A COURT PROCEEDING. ANY ARBITRATION UNDER THIS AGREEMENT WILL ONLY BE ON AN INDIVIDUAL BASIS. CLASS ARBITRATIONS, CLASS ACTIONS, PRIVATE ATTORNEY GENERAL ACTIONS, AND CONSOLIDATION WITH OTHER ARBITRATIONS ARE NOT PERMITTED.

Filing No. 190-4 at 8–9.  The updated terms and conditions also added language about arbitration, the Federal Arbitration Act, and a provision requiring all actions, including arbitration, to occur in Muscogee County, Georgia.  Filing No. 190-6 at 8–9.

CPAY provided notice to 56,290 merchants that were processing through CPAY in February 2021.  *Id.*  At the time of this notice, plaintiffs had already filed this lawsuit. CPAY did not provide any evidence that it sent any other kind of notice to merchants. CPAY also defended its update by arguing it wrote the new terms and conditions without considering the pending litigation.  *Id.* at 11 fn.1.

Procedural History

Plaintiffs sued CPAY in August 2017 and claim CPAY breached their contract with unjustifiably high and unexpected charges and fees, CPAY acted in enterprise with their individual contractors to defraud merchants under civil RICO, and CPAY fraudulently misrepresented their business to merchants under relevant Nebraska law.  After Plaintiffs prevailed on CPAY's motions to dismiss and summary judgment, Plaintiffs moved to certify the class.  Filing No. 88 at 1.

This Court certified the putative class action on February 20, 2020.  *Id.*  The certified class includes "[a]ll of CPAY's customers that, from January 1, 2010, to the

present (a) were assessed the TSSNF Fee (a/k/a TSYS Network Fee); (b) were assessed the PCI Noncompliance Fee; (c) had their contractual credit card discount rates increased above their contractual rate by CPAY; and/or (d) had credit card transactions shifted by CPAY from lower-cost rate tiers to higher-cost rate tiers." *Id.*  This Court granted CPAY's motion to stay proceedings pending appeal. Filing No. 169 at 6.  CPAY appealed the class certification, and the Eighth Circuit affirmed this court's class certification order. CPAY then filed a writ of certiorari with the Supreme Court.

By certifying the class from January 1, 2010, to the present, this Court created three potential sub-groups of class members.  First, there are former merchants, like the named Plaintiffs, who previously used CPAY's services, but no longer use CPAY's services.  Second, there are current merchants, who are any merchants that can meet all four requirements of the class certification and are still processing payments with CPAY under contract.  Current merchants are merchants who, during their normal business with CPAY, became subject to the updated terms and conditions as of April 1, 2021.  Lastly, there are new merchants, who are merchants that began processing payments with CPAY after November 1, 2020 and signed onto the updated terms and conditions when they signed their contract with CPAY.

Proceedings resumed in this case after the Eighth Circuit affirmed class certification in December 2020.  In January of 2021, the parties gathered and submitted a final amended progression order to the Court and scheduled a Status Conference for September 2021.  Three months later, on April 29, 2021, CPAY filed its motion to stay in order to compel arbitration according to the terms and conditions they began rolling out

in November 2020.  CPAY filed a second, related motion to amend its answer with its motion to stay.  Both are motions are now in front of this Court.

## DISCUSSION

*Motion to Stay in Order to Compel Arbitration*

Congress enacted the Federal Arbitration Act (FAA) "in response to widespread judicial hostility to arbitration agreements."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011).  Under § 2 of the FAA, a written arbitration agreement arising out of a contract or transaction "shall be valid, irrevocable, and enforceable" unless there is justifiable revocation at law or in equity.  *Id.* (citing Federal Arbitration Act, 9 U.S.C. § 2).  If two parties have a binding arbitration agreement, when a party chooses not to follow that agreement, the other party can petition the court to compel arbitration under § 4.  *Art Etc. LLC v. Angel Gifts, Inc.,* 686 F.3d 654, 656 (8th Cir. 2012).  Absent a valid arbitration agreement, the Court cannot grant CPAY's motion for stay.

As a threshold issue, it is important to define which sub-group of merchants CPAY asserts its motions against.  CPAY claims their new arbitration agreement requires that two of the three sub-groups within the certified class face arbitration: (1) new merchants and (2) current merchants that did not affirmatively opt out of their contracts as of April 1, 2021.  Filing No. 188 at 8–10.  This Court certified the class with the temporal range between "January 1, 2010 to the present."  Filing No. 142 at 34–35.  While the Court did not define what "to the present" includes, Plaintiffs conceded that their class cut-off date was October 31, 2020, thus precluding new merchants from being a part of the certified class.  Filing No. 201 at 6 fn.1.  Since new merchants are not included in the certified

class, the Court need not determine the arbitration agreement's impact on them.   The only issue to resolve is the arbitration agreement's impact on current merchants.

It is a "fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC,* 563 U.S. at 339.   A court compels arbitration if the parties "entered a valid arbitration agreement, and if so, whether the parties' particular dispute falls within" the arbitration agreement's scope. *Sommerfeld v. Adesta, LLC,* 2 F.4th 758, 761 (8th Cir. 2021) (quoting *Parm v. Bluestem Brands, Inc.,* 898 F.3d 869, 873 (8th Cir. 2018)).   Whether a valid arbitration agreement exists is a question of state law, while determining the scope of the agreement follows federal substantive law on arbitrability.   *Donaldson Co., Inc. v. Burroughs Diesel, Inc.,* 581 F.3d 726, 731 (8th Cir. 2009).   If a valid arbitration agreement exists, then courts should liberally construe it to resolve doubts in favor of arbitration. *Unison Co. v. Juhl Energy Dev., Inc.,* 789 F.3d 816, 818 (8th Cir. 2015).   Here, the arbitration agreement is not valid, so the Court does not need to analyze its scope.

   *a.  CPAY's Choice of Law Provisions*

Plaintiffs originally sued in the District Court for the District of Nebraska to comply with the terms and conditions of their Merchant application.   *See* Filing No. 46 at 8, ¶25. This Court has applied Nebraska state law throughout this litigation.   *See* Filing No. 87 at 9; Filing No. 142 at 24–25.   CPAY contends that this Court should no longer apply Nebraska law, but should apply Georgia law because it is its new choice-of-law provision per the updated terms and conditions.   Filing No. 188 at 14 fn.2.

"A district court sitting in diversity jurisdiction applies the conflict of law rules for the state in which it sits." *DCS Sanitation Mgmt., Inc. v. Castillo*, 435 F.3d 892, 895 (8th Cir. 2006) (citations omitted).   For conflict of law rules, Nebraska adopted the Restatement

(Second) of Conflict of Laws. *Am. Nat. Bank v. Medved*, 281 Neb. 799, 806, 801 N.W.2d 230, 236–37 (Neb. 2011). While Nebraska courts generally allow parties' choice of law, there still must be a "substantial relationship to the parties or the transaction." *DCS Sanitation Mgmt., Inc.*, 435 F.3d at 896. Relevant principles that indicate whether a relationship is substantial includes "place of contracting. . .place of performance, the location of the subject matter, and the domicil or residence of the parties." *Powell v. Am. Charter Fed. Sav. and Loan Ass'n*, 514 N.W. 2d 326, 331 (Neb. 1994).

CPAY argues that the Court should apply Georgia law because it is the choice of law in the updated terms and conditions. However, CPAY does not have a substantial relationship with Georgia and failed to justify changing the applicable law midway through litigation. CPAY provided no evidence to support its claim to a substantial relationship with Georgia. CPAY's only argument in support of applying Georgia law is that its parent company has its headquarters is in Georgia. Filing No. 188 at 14 fn.2. CPAY's parent company's presence in Georgia is not enough to establish a substantial relationship. *See DCS Sanitation Mgmt., Inc.*, 435 F.3d at 896 (denying choice-of-law provision because "[t]he only relationship between [proposed state] and the parties is the location of Plaintiff's corporate headquarters and principal place of business.").

While Georgia has no substantial relationship to this litigation, Nebraska does. CPAY has admitted to doing substantial business in Nebraska, as well as four years of litigation that applied Nebraska state law. Filing No. 96 at 4, ¶24; Filing No. 46 at 8, ¶24. CPAY relied on FNBO as its acquiring bank for ten years, in which FNBO was CPAY's point of access to reach all merchants accounts. Filing No. 91-2 at 20. Furthermore, CPAY included Nebraska as its preferred venue during that same ten-year period. *Id.* at

21.  Changing the applicable state law during litigation without a substantial relationship to Georgia would be unreasonable.  *See First Nat'l Bank in Mitchell v. Daggett*, 497 N.W.2d 358, 363 (Neb. 1993) (denying the application of Georgia state law because the parties have no contacts within Georgia, no parties are from the state, and the subject matter is not in Georgia).  CPAY's choice-of-law provision requesting Georgia state law in the updated terms and conditions cannot apply, so Nebraska state law still applies. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 (applying law of state with "the most significant relationship").

b.  *Nebraska State Contract Law Applies*

State contract law determines the validity of an arbitration agreement.  *E.E.O.C. v. Woodmen of the World Life Ins. Soc'y*, 479 F.3d 561, 565 (8th Cir. 2007) (citing *Faber v. Menard Inc.,* 367 F.3d 1048, 1052 (8th Cir. 2004)).  Under Nebraska law, arbitration "is purely a matter of contract."  *Cornhusker Int'l Trucks v. Thomas Built Buses, Inc.*, 637 N.W.2d 876, 879 (Neb. 2002).  To create a contract, "there must be both an offer and an acceptance; there must also be a meeting of the minds or binding mutual understanding between the parties to contract."  *Lindsay Ins. Agency v. Mead*, 508 N.W.2d 820, 825 (Neb. 1993).  The question of whether the parties intended to contract is a factual one for the finder of fact to resolve.  *Gerhold Concrete Co., Inc. v. St. Paul Fire & Marine Ins. Co.*, 695 N.W.2d 665, 672 (Neb. 2005).

Plaintiffs do not challenge the validity of the entire Merchant application but argue that the Arbitration Agreement (within the updated terms and conditions) is unconscionable.  *See Doctor's Assoc., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996) ("[G]enerally applicable contract defenses, such as . . . unconscionability, may be applied

11

to invalidate arbitration agreements without contravening § 2 [of the FAA].").  Despite the strong favor granted to arbitration agreements, if a party challenges the validity of the agreement, then "the federal court must consider the challenge before ordering compliance" under § 4 of the FAA.  *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 71 (2010).  Plaintiffs argues that under current Nebraska law, the arbitration agreement is unconscionable both substantively and procedurally, and, therefore, it is not a valid agreement.  *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) ("[B]efore referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists.").

   *a.  Unconscionability*

   An unconscionable agreement is "[a]n agreement that no promisor with any sense, and not under a delusion, would make, and that no honest and fair promisee would accept."  *Unconscionable Agreement*, BLACK'S LAW DICTIONARY (11th ed. 2019).  The Nebraska Supreme Court defined "unconscionable" as "manifestly unfair or inequitable." *Myers v. Neb. Inv. Council*, 724 N.W.2d 776, 799 (Neb. 2006).  A contract can be procedurally or substantively unconscionable, but it needs to be both to void the contract. *Id.* (citing *Adams v. Am. Cynamid Co.*, 498 N.W.2d 557, 591 (Neb. App. 1992)).  The "basic test" of unconscionability is determining if the "clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of making the contract . . .." *Adams*, 498 N.W.2d at 589 (citing *T.V. Transmission v. City of Lincoln*, 374 N.W.2d 49, 56 (Neb. 1985)).

1.   Procedural Unconscionability

Procedural unconscionability relates "to impropriety during the process of forming a contract." *Ficke v. Wolken*, 858 N.W.2d 249, 258 (Neb. App. Ct. 2014) (citing *Adams*, 498 N.W.2d at 590).  The disparity in bargaining positions, as well as the totality of the circumstances surrounding the agreement, are essential to determining procedural unconscionability.  *Myers*, 724 N.W.2d at 799.  Additionally, there are three factors that courts emphasize in assessing procedural unconscionability: "(1) the manner in which the parties entered into the contract, (2) whether the parties had a reasonable opportunity to understand the terms of the contract, and (3) whether the important terms were hidden in a maze of fine print." *Parizek v. Roncalli Cath. High Sch.*, 655 N.W.2d 404, 409 (Neb. App. Ct. 2002) (citing *Adams*, 498 N.W.2d at 590).

Plaintiffs claim that CPAY's arbitration agreement illustrates a disparity in bargaining power and displays impropriety in the making of the contract.  Plaintiffs argue that there was uneven bargaining power in CPAY's take-it-or-leave-it agreement and impropriety through CPAY's failure to alert Current Merchants or class counsel about the risk to their litigation rights.  CPAY responded with the same argument they raised at class certification; through the "BANK's delegated rights," CPAY can update the terms and conditions on 30 days' notice without merchant's consent, so the agreement is valid. *See* Filing No. 142 at 6; Filing No. 188 at 17–18.  Since Wells Fargo delegated its rights to TSYS, CPAY argues it could update the terms and conditions of the Merchant application.

Take-it-or-leave-it provisions are not inherently unconscionable, but it is a measure within the totality of circumstances. *Id.*  CPAY cites one case to support implementing a

take-it-or-leave-it provision that impacts pending litigation, *Chen-Oster v. Goldman, Sachs & Co.* Filing No. 188 at 15. *Chen-Oster* is not dispositive because it only allowed the take-it-or-leave-it provision only after measuring the totality of the circumstances. *Chen-Oster v. Goldman, Sachs & Co.,* 449 F. Supp. 3d 216, 263–64 (S.D.N.Y. 2020). While courts generally accept take-it-or-leave-it agreements as standard practice in today's business world, the take-it-or-leave-it provisions are usually accepted long before pending litigation. *See Cicle v. Chase Bank USA,* 583 F.3d 549, 555 (8th Cir. 2009) (permitting an updated take-it-or-leave-it arbitration agreement, but two years before litigation ensued).

There is a disparity in bargaining power between CPAY's arbitration agreement and Current Merchants because CPAY offered a one-sided ultimatum: stop using TSYS's payment processing services and pay a termination fee or face arbitration. Filing No. 210 at 15; Filing No. 190-1 at 7, ¶30. Compliance with the arbitration agreement would require current merchants to surrender their current litigation rights, thus requiring the parties to likely repeat much of what the litigation already addressed during four years of litigation. *See* Filing No. 210 at 14–15 (implicitly agreeing that the arbitration agreement was take-it-or-leave-it); *Kelly v. Golden,* 352 F.3d 344, 349–50 (8th Cir. 2003) (removing parties from litigation to arbitrate can extensively duplicate the parties' efforts). CPAY did not provide current merchants any ability to negotiate or require any affirmative action from current merchants to constitute acceptance—which broadened the bargaining disparity. CPAY claims it implemented the change with no regard to the pending litigation, despite the creation of the lengthy and thorough arbitration language. Filing No. 201 at 16.

The timing of the arbitration agreement heightens the disparity in bargaining power is from the arbitration agreement's take-it-or-leave-it nature.  *See Hollins v. Debt Relief of Am.*, 479 F. Supp. 2d 1099, 1106 (D. Neb. 2007) (describing the connection between parties with superior bargaining power and adhesion contracts (or take-it-or-leave-it) provisions)).  Even if CPAY educated current merchants to the implications of the new arbitration agreement, current merchants would have likely needed to pay a fine to cancel their contract or wait until after the arbitration agreement took effect.  Additionally, CPAY did this without alerting any party to this litigation, despite setting a status conference for September and meeting with class counsel.  Filing No. 202-1 at 2.

A disparity in bargaining power alone does not always make an arbitration agreement unenforceable, so the Court next turns to the other procedural unconscionability factors listed in *Parizek* to complete to the totality of the circumstances in this case.  *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 33 (1991).

First, the manner in which the parties entered into the contract displays CPAY's impropriety.  At the time of this agreement, current merchants were participants in litigation that started four years prior, and class certification was over a year old.  Yet, CPAY's notice does not notify current merchants what the terms and conditions change in the original merchant application, and the terms and conditions is silent on its impact on pending litigation.  Filing No. 190-1 at 6–7, ¶27–¶29.  Current merchants are offered no opportunities that would allow them to continue processing payments and maintain their current litigation.  Even if CPAY availed current merchants of the risk to their litigation rights, current merchants would have likely needed to pay a fee to opt out of their contracts and avoid arbitration.  Filing No. 190-1 at 7, ¶30.

15

CPAY's notice did not provide current merchants with a reasonable opportunity to understand the terms of the contract either. CPAY did not send current merchants the updated terms and conditions but provided a link at the bottom of a monthly billing statement. *Id.* While CPAY emphasized there was an arbitration agreement in the updated terms and conditions, CPAY required Current Merchants to find the updated terms and conditions themselves, interpret if the agreement applies retroactively regarding their pending litigation rights, and make a decision that impacts their business's ability to collect money, all within 30 days. Plaintiffs' class counsel even testifies that CPAY never told them about the new terms and conditions—which class counsel would have been more equipped to interpret the agreement than Current Merchants—until after the arbitration agreement took effect. Filing No. 190-1 at 3, ¶8–¶11; *see Rattray v. Woodbury Cnty., IA,* 614 F.3d 831, 836–37 (8th Cir. 2010) (detailing how class counsel adequacy requirements provide critical safeguards against due process concerns that are inherent in class actions). Given the totality of the circumstances, the Court finds the arbitration agreement was procedurally unconscionable, so next it must turn to the substance of the contract.

2. Substantive Unconscionability

Substantive unconscionability involves clauses that are "one-sided or overly harsh." *Ficke*, 858 N.W.2d at 258. "A contract is not substantively unconscionable unless the terms are grossly unfair under the circumstances that existed when the parties entered into the contract." *Id.* A court must also make this determination "in light of the general commercial background and commercial needs of a particular case" to see if the "clauses are so one-sided as to oppress or unfairly surprise one the parties." *Adams,* 498

N.W.2d at 590 (quoting *Barnes v. Helfenbein*, 548 P.2d 1014, 1020 (Okla. 1976)). However, when both parties have business experience, the damages are purely economic, and the parties had a fair opportunity to consider the agreement, courts "rarely find that liability limitations are unconscionable." *Reichert v. Rubloff Hammond, L.L.C.*, 645 N.W.2d 519, 527 (Neb. 2002).

Contrary to the procedural unconscionability analysis that measures a totality of the circumstances, substantive unconscionability requires a snapshot of the circumstances at the time the parties entered into the agreement. *Myers*, 724 N.W.2d at 799. When the current merchants failed to affirmatively opt out of their contracts with CPAY, they entered into the arbitration agreement. Filing No. 188 at 12. When the parties entered into the arbitration agreement, the pending litigation was four years old and class certification occurred over year before. CPAY only provided current merchants with a link to the updated terms and conditions a month before they took effect. The terms are grossly unfair under the circumstances surrounding the parties when they entered the agreement because current merchants had no way of knowing that they would lose their litigation rights if they agreed to the updated terms.

In addition to the unconscionability when the parties entered into the agreement, the content of the agreement is one-sided and overly harsh. Since CPAY processes each merchants' credit and debit payments, current merchants heavily rely on CPAY to conduct their business. Filing No. 1 at 2–3. This reliance further shows how the terms are grossly unfair because current merchants could only continue processing payments, while CPAY could preclude 56,290 current merchants from potential treble damages and exclude them from litigating in a class action case against them. *See Ficke*, 858 N.W.2d at 258

(implying that a windfall can be representative of substantive unconscionability).  CPAY did not communicate with current merchants that the arbitration agreement changed how they operate or that it removed them from the pending litigation.  *See Mobile Elec. Serv., Inc. v. FirsTel, Inc.*, 649 N.W.2d 603, 606 (S.D. 2002) (finding a contract one-sided and unconscionable because the non-drafting party had no way of knowing what they were agreeing to do).

CPAY raises no argument against Plaintiffs' claim of substantive unconscionability. Instead, CPAY contends that Plaintiffs conceded the arbitration agreement was not substantively unconscionable.  Filing No. 210 at 14.  CPAY misrepresents Plaintiffs' concession, because the specific footnote CPAY cites only reiterates the concession that new merchants (merchants signing their CPAY contract after Nov. 1, 2020) are not within the certified class, thus not subject to this litigation.  *See* Filing No. 201 at 6 fn.1 ("Plaintiffs do not contend that [Current] merchants are part of the class. . .. As a result, Plaintiffs stipulate to end the class period on October 31, 2020 . . ..").  CPAY raises no other argument to refute Plaintiffs' substantive unconscionability claim other than current merchants conceded it did not apply.  Filing No. 210 at 14.

CPAY's arbitration agreement is both procedurally and substantively unconscionable, therefore the arbitration agreement is invalid as to the current merchants.[2]  CPAY cannot stay this litigation to arbitrate with current merchants, nor can

---

[2] CPAY also argues in their Reply Brief that the 2021 Arbitration Agreement should be enforceable because it was a valid modification to an existing contract and Current Merchants assented to the new agreement.  Filing No. 210 at 14–15.  The arbitration agreement cannot prevail because it is unconscionable, CPAY's power to modify their contract does not give them the authority to violate contract principles of conscionability.  CPAY's failure to show how the terms and conditions change the course of conduct for Current Merchants—which CPAY fails to explain how Current Merchants can assent to changes by conducting business as usual—does not make a facial argument given the Court's analysis of CPAY's procedural posture in implementing this contract.

it halt litigation to arbitrate a claim that arose four years before the arbitration agreement. *See In re Currency Conversion Fee Antitrust Litigation*, 361 F. Supp. 2d 237, 252 (S.D.N.Y. 2005) [hereinafter *In re Currency Conversion III*] (holding an added arbitration clause was unconscionable because the drafting party withheld information about the arbitration clause's impact on the pending litigation).

  b. *CPAY's Reliance on Chen-Oster*

  CPAY relies on *Chen-Oster v. Goldman, Sachs & Co.* to support its claim that its conduct is not unconscionable and a valid exercise through the power delegated to them from Wells Fargo.  *See* Filing No. 188 at 21–28 (concluding this Court should adopt the reasoning of *Chen-Oster* through its five-factor analysis to prove the Arbitration Agreement is enforceable).  While *Chen-Oster* has no controlling authority over this Court, it does provide a useful collection of cases regarding updated arbitration agreements during a class action's pendency.  *See Chen Oster v. Goldman, Sachs & Co.*, 449 F. Supp. 3d at 256–64 (summarizing nine cases at the trial and appellate levels that addressed a defendant company's mid-litigation arbitration agreement update to current employee contracts).  *Chen-Oster* lays out different factors to show why Plaintiffs, as "highly sophisticated bankers," did not experience any coercion when faced with an arbitration agreement during a pending class action. *Id.* at 264–70.

  CPAY argues that, aligned with *Chen-Oster*, Plaintiffs faced no coercion because they could use any other service's payment processing; thus, there is no unconscionability. Filing No. 188 at 25.  This contention ignores the heightened potential for coercion that created the unconscionability here.   Unlike *Chen-Oster*, current merchants did not have vital information as to the impact of the updated terms and

conditions. They depended on CPAY's payment processing for their businesses' operations and faced a potential fine for opting out of their contract. *See* Filing No. 91-2 at 9 (requiring). Akin to *In re Currency Conversion*, CPAY omitted valuable information surrounding the circumstances of the updated arbitration agreement, which prevented Current Merchants from making an informed decision. *In re Currency Conversion Fee Antitrust Litigation*, 361 F. Supp. 2d 237, 253 (S.D.N.Y. 2005) [hereinafter *In re Currency Conversion III*]; *but see Chen-Oster,* 449 F. Supp. 3d at 264 (concluding no coercion in part because plaintiffs had the necessary information and would not lose anything by opting out of the new arbitration agreement).

The only difference between *In re Currency Conversion III* and this case, is CPAY did not target class members for the arbitration agreement. CPAY could not seek out class members in the same manner as *In re Currency Conversion III* because CPAY's notice applied to every current merchant. Every current merchant could potentially be a class member, hence why CPAY's motion includes every current merchant. Filing No. 188 at 12. Plaintiffs could not prove that CPAY specifically sought out potential class members because when CPAY updated their terms and conditions, the update applied to every potential class member in which the arbitration agreement applied.

Furthermore, the analysis in *Chen-Oster* included a sixth factor, the "totality of circumstances," as this Court analyzed above. *Id.* at 269–70. CPAY cannot prevail under the reasoning of *Chen-Oster* when considering the totality of circumstances. *See id.* at 258 (underscoring evidence of coercion and deception in previous decisions that held updating arbitration agreements during pending litigation was unconscionable). When parties gathered with the Court to create a schedule in January 2021, even though CPAY

was three months into their updated terms and agreement roll-out, CPAY alerted no one of the impending motion to stay.  When CPAY sent out a notice about the update to Current Merchants in February 2021, it did not alert anyone that putative class members could lose their ability to join the class until filing its motion to stay two months later.  The arbitration agreement does not discuss the impact on the pending litigation and forced current merchants to opt out of CPAY's services and pay a fee if they did not want to give up their litigation rights.  *See In re Currency Conversion III*, 361 F. Supp. 2d at 253 (holding a mid-litigation arbitration agreement was unconscionable because it tethered plaintiff's only source for credit needs upon withdrawing from class action).

CPAY's argument that all five of the *Chen-Oster* factors favor a stay mischaracterizes the misleading and coercive nature of sending the notice without any pertinent information referencing the pending litigation or including that information within the terms and conditions.  It also mischaracterizes the multiple steps CPAY took to not avail current merchants, class counsel, or this Court about the pending updated terms and conditions that began rolling out five months before CPAY's motions.  CPAY supplements its counterargument with Georgia law, which does not apply for the reasons above.  Filing No. 210 at 15–16.  Overall, CPAY misplaced their reliance on *Chen-Oster*, and it does not support compelling arbitration in this case.

<u>Motion to Amend Answer</u>

CPAY's motion to amend its answer relates to their motion to stay to compel arbitration.  The crux of CPAY's argument is that because they could not have raised their arbitration defense any time sooner, the Court should acknowledge their diligence and provide them an opportunity to have their answer reflect this defense.  *See* Filing No. 191

21

at 5–6.  "A district court appropriately denies the movant leave to amend if 'there are compelling reasons such as undue delay, bad faith, or dilatory motive . . .undue prejudice to the non-moving party, or futility of the amendment." *Sherman v. Winco Fireworks, Inc.,* 532 F.3d 709, 715 (8th Cir. 2008) (quoting *Moses.com Sec., Inc. v. Comprehensive Software Sys., Inc.,* 406 F.3d 1052, 1065 (8th Cir. 2005)).  Since the Court denied their motion to stay to compel arbitration, their motion to amend their answer is futile.

THEREFORE, IT IS ORDERED THAT

1.  Defendant's motion to stay to compel arbitration, Filing No. 187 is denied

2.  Defendant's motion to amend answer, Filing No. 191 is denied.

Dated this 9th day of December, 2021.

BY THE COURT:

s/ Joseph F. Bataillon_____
Senior United States District Judge