# EXHIBIT 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| CUSTOM HAIR DESIGNS BY SANDY, LLC, and SKIP'S PRECISION WELDING, LLC, on behalf of themselves and all others similarly situated,<br><br>         Plaintiffs,<br><br>v.<br><br>CENTRAL PAYMENT CO., LLC,<br><br>         Defendant. | CASE NO. 8:17-cv-00310-JFB-CPZ |

### SUPPLEMENTAL JOINT DECLARATION OF
### TYLER W. HUDSON AND MATTHEW C. KLASE

1.     We are lead counsel for Plaintiffs and the Class in the above-referenced matter and submit this joint declaration in support of the motion for final approval of class settlement and motion for attorneys' fees, expenses, and service awards, and as a supplement to the joint declaration we previously filed with the Court. (Dkt. 328-1). Unless otherwise noted, we have personal knowledge of the facts set forth in this declaration and could testify competently to them if called upon to do so.

2.     The practice at our firms is to enter the time spent on a matter (including contingency matters) on a daily basis. These time records reveal that from the inception of this matter through April of 2022, our firms logged in excess of 13,200 hours on this case. This total does not include the hours logged by the firms of our trial co-counsel, Domina Law Group, or our appellate co-counsel, Gupta Wessler.

3.     Our work included extensive pre-suit investigation; the preparation of two complaints, multiple dispositive motions, responses to CPAY's many dispositive motions and petitions, and an appellate brief; the review and evaluation of the more than 450,000 pages of documents that were

produced in this action and the substantial written discovery that was exchanged; consultation and work with four different expert witnesses; preparation for and examination or defense of 21 depositions; analysis of the many substantive rulings of this Court and the Eighth Circuit; research of governing precedent; detailed trial preparation; mediation, negotiation, and drafting of the Settlement; preparation of the approval papers; work with the settlement administrator on the notice program; and communications with Class members.

4.      Each of the above-described efforts was essential to reaching the final approval stage of the Settlement before the Court.  Indeed, our extensive knowledge, investigation, discovery, and briefing allowed us to better understand the merits of these actions and the damages of the Class, prepared us for the mediations and settlement discussions, and successfully positioned us to engage in vigorous, arm's length negotiations under the direction of mediator Hunter Hughes.  Our work with the settlement administrator has shown us that the notice program has been thorough and robust and that Class members appreciate the litigation and Settlement.

5.      Since the Court issued preliminary approval, we have worked on a near-daily basis with Epiq – the appointed settlement administrator – to ensure that all Class members were provided notice in accordance with the notice program and the Court's preliminary approval Order.

6.      In doing so, we have (a) reviewed and edited the email, postcard, and long form notices, the claim form, and the content of the settlement website and telephone IVR scripts; (b) ensured notice was timely sent; (c) answered direct, individual inquiries from Class members via telephone and/or email; and (d) monitored those notices that could not be successfully delivered and the claims response.

7.      We also have prepared (and will file) a motion for final approval and will appear at the final approval hearing.

8.      Even if the Settlement is approved, our work will continue past the final approval hearing and will not conclude until all Class member payments are negotiated and the Settlement is fully consummated.  Based on the planned timeline and our experience, this process will likely take more than a year of additional work, including hundreds of hours answering questions from Class members, overseeing cash distributions, and finalizing the Settlement.

9.      The case involved difficult factual issues.  For example, it is very difficult to identify – let alone establish liability based upon – the overcharge practices that lie at the heart of this litigation.  We had to decipher a complex industry that defies transparency; comprehend byzantine billing practices; and analyze voluminous documents and data that covered more than a decade.

10.      Moreover, the case presented novel legal issues, such as the enforceability and applicability of the contractual provisions that CPAY includes in its form contracts in an attempt to exculpate itself from overbilling; whether a valid RICO enterprise could be pled; whether the RICO and fraudulent inducement claims presented individual reliance issues that could defeat certification; whether CPAY had sufficient records to allow the Class members to be ascertained and individual damages calculated; and whether a nationwide Class comprised of more than 185,800 merchants could be managed and certified.

11.      Litigation of this case required counsel highly trained in class action law and procedure as well as counsel familiar with the specialized issues at bar.  Indeed, the uncovering of CPAY's purported overbilling and positioning of this case for class certification and a potential for victory on the merits presented challenges most law firms, in our experience, are simply not able to meet.

12.    Over the past five years, Webb, Klase & Lemond ("WK&L") have handled several class actions against payment processing companies.  We believe this experience was vital to a full understanding of this matter and the ability to navigate many of the challenges presented by this case. If we had not taken on this case, we would have been able to spend significant time on other matters. This is especially true for WK&L, a small firm with only three partners.  Similarly, Wagstaff & Cartmell ("W&C") is far smaller than typical class action defense firms.  After agreeing to assume the role as lead counsel in this case, W&C committed substantial resources to prosecute the case and prepare it for trial. In fact, for substantial periods of time W&C partners were working exclusively on this case to ensure that the work was done properly and that CPAY and its counsel understood that we intended to take the case to trial.  Due in significant part to the time and resources required by this case, both firms have turned down cases and foregone other client opportunities as a result of this litigation.

13.    As a Kansas City-based law firm, W&C partners have knowledge about the market rates for legal services in the Midwest and in the Eighth Circuit.  We also have had discussions with our Nebraska co-counsel, Dave Domina, and with Minnesota-based class action attorney Dan Gustafson.  We understand that individual contingency fee cases in the geographic areas within the Eighth Circuit typically call for a fee of one-third to 40 percent of the recovery.

14.    Consistent with this practice, we entered into contingent fee agreements with each of the Class Representatives – with whom we had no prior relationships – providing for payment of one-third to 40 percent of any recovery, with 40 percent being applied to any successful result obtained after the case was filed.

15.    Because we took this case on a contingency fee basis, had we not achieved a recovery, we would have received nothing and, in fact, would have suffered substantial out-of-pocket losses

4

because we advanced all the litigation expenses.  WK&L has lost cases very similar to this one –

including two in the payment processing industry – and received nothing for its enormous efforts and

no reimbursement for substantial out-of-pocket expenses.  Uncompensated expenditures of such

magnitude can severely damage (or even destroy) small firms like ours.

16.    It was extremely risky for our firms to bring these cases.  To even have a chance to

prevail, we knew we would need to overcome the exculpatory provisions buried in CPAY's form

contracts despite unsettled law on this issue – law that would subsequently become more difficult

as the case progressed.  *See Zam & Zam Super Market, LLC v. Ignite Payments, LLC*, 736 Fed.

Appx. 274, 277-78 (2d Cir. 2018) (affirming dismissal of breach claim on grounds merchant did

not provide timely notice of challenged fees in accordance with contract); *Cobra Tactical, Inc. v.

Payment Alliance Int'l, Inc.*, 315 F. Supp. 3d 1342, 1350-51 (N.D. Ga. 2018) (dismissing breach claim

on grounds merchant did not provide timely notice of challenged fees in accordance with contract).

Additionally, it is always challenging to certify a nationwide class action (and defend such

certification on appeal), especially given CPAY's claims that the contracts were not uniform and

had varied terms.

17.    Even if we could overcome such hurdles, we would then have had to fend off

CPAY's numerous defenses to the merits of the case, prevail at trial, and then hold onto that

result through an inevitable appeal of the verdict.  Such dispositive risks should not be ignored.

18.    CPAY has been represented by skilled attorneys throughout these actions, including

Atlanta-based attorneys Jon Chally (formerly of King & Spalding, currently of Council, Gunneman &

Chally) and Brandon Keel (of King & Spalding).  They were highly skilled adversaries throughout

this litigation.  CPAY also brought in one of King & Spalding's leading appellate attorneys from

Washington D.C. to brief and argue its class certification appeal at the Eighth Circuit and present its

certiorari petition to the Supreme Court, and we understand that David Balser, the head of King & Spalding's nationwide class action practice, who is a Fellow in the American College of Trial Lawyers, was planning to act as one of the lead attorneys for CPAY at trial. These lawyers' tenacious representation of CPAY makes the Settlement all the more impressive.

19.    It is believed that this is the only case brought against CPAY for the practices at issue, despite the fact that merchant websites have for years included numerous complaints about various fee practices. At the time we filed this case, we believed that this class action would likely focus on a breach of contract claim related to a few specific fees, as reflected in the initial Complaint. After the case was filed and we pressed CPAY for internal documents and emails, however, we discovered through substantial effort that the evidence would support fraud-based claims that were national in scope. We then filed an Amended Complaint that added claims for fraudulent concealment and RICO violations, and we worked vigorously with experts to develop these claims and supporting damages-models. Through these efforts to unearth evidence from CPAY's internal files, we greatly expanded the scope of the case, and increased CPAY's exposure considerably. We then drew on our considerable experience in litigating fraud and RICO claims to withstand CPAY's various challenges to these claims both on the merits and at class certification. We also committed substantial resources to prepare for trial, including working with experienced jury consultants to refine our theories, focus the evidence, and optimize our chances of success. Thus, our efforts in this case, using our knowledge of complex legal areas of the law, created tens of millions of dollars of monetary value for all members of the Class.

20.    As of the signing of this declaration, no objections have been filed in the case, nor have we received notice that any Class members intend to object to the Settlement. The Class members who have contacted us concerning the Settlement have given overwhelmingly positive

feedback. Moreover, as of the signing of this declaration, the settlement administrator reports that only three (3) Class members have requested exclusion (i.e., opted out) since notice of the Settlement was sent.

21.     At our own expense, we have sent reminder emails to Class members with valid email addresses who have not yet filed claims. These reminder emails have been effective. In our experience, the claims rate ticks up whenever these reminders are sent. We will continue to send such emails until the claims deadline. We expect these reminders will continue to increase the response rate.

22.     We request a fee of one-third of the $84 million settlement amount.

23.     Through the filing of this motion, we have incurred (and request reimbursement for) a total of $1,209,102.88 in litigation expenses. The requested sum is equivalent to specific out-of-pocket expenses that were incurred while prosecuting and settling the case and includes:

(a)     certification and liability expert witness fees – $871,465.13;

(b)     court reporter fees and deposition transcript costs – $79,597.19;

(c)     jury consultant fees – $75,051.45;

(d)     fees for providing notice of class certification – $58,749.90;

(e)     document storage and hosting fees – $46,466.97;

(f)     legal research fees – $26,108.05;

(g)     mediator fees – $20,000.00;

(h)     coach class travel costs – $18,156.18;

(i)     filing and service fees – $6,722.77; and

(j)     necessary administrative expenses (i.e., PACER charges, copies, postage, delivery fees, etc.) – $6,785.24.

24.     All such expenses are reasonable and were necessarily incurred in furtherance of these actions. The expert witness expenses, in particular, were integral to the Class's chances of

7

success and our firms agreed to pay such costs without guarantee they would ever be reimbursed.

25.     Notably, we do not seek any expenses for the period after final approval.  Sometimes there can be substantial expenses during this phase.

26.     We enthusiastically support $15,000 service awards for each of the two named Plaintiffs/Class Representatives to be paid from the settlement fund.    Indeed, the Class Representatives took time away from the day-to-day operation of their small businesses to devote substantial time and effort to the litigation, made themselves available for conferences with our team, gathered and produced all of their written documentation, responding to written discovery, sat for lengthy depositions and deposition preparation, kept themselves abreast of the proceedings for nearly five years, prepared for trial and for the necessary travel to Nebraska for up to two weeks, and subjected themselves to the time, expense, and risk of complex class action litigation.  In addition, both Class Representatives exposed themselves to the risk and media attention that accompanies litigating with a powerful company such as CPAY.  But for the Class Representatives' service and willingness to bear these risks, other Class members would have received nothing.

27.     We wholeheartedly recommend the Settlement as an excellent result for the Class.

We declare under penalty of perjury that the foregoing is true and correct to the best of our knowledge, information, and belief.

Executed this 6th day of May, 2022, in Kansas City, Missouri.

/s/ Tyler W. Hudson
Tyler W. Hudson

Executed this 6th day of May, 2022, in Atlanta, Georgia.

/s/ Matthew C. Klase
Matthew C. Klase

8